

# In the Missouri Court of Appeals
# Eastern District

## DIVISION ONE

| | | |
|---|---|---|
| CHRISTOPHER COLE, | ) | Nos. ED111377 and ED111378 |
| | ) | |
| Respondent, | ) | Appeal from the Circuit Court |
| | ) | of St. Louis County |
| vs. | ) | 20SL-CC02495 |
| | ) | |
| THE KANSAS CITY SOUTHERN | ) | Honorable David Lee Vincent III |
| RAILWAY COMPANY, | ) | |
| | ) | |
| Appellant. | ) | Filed:  August 13, 2024 |

The Kansas City Southern Railway Company ("Railroad") appeals the November 2022 judgment and the January 2023 amended judgment, both entered after a jury trial, in favor of Christopher Cole ("Plaintiff") on his action under the Federal Employers' Liability Act ("FELA"), 45 U.S.C. sections 51-60, which asserted a negligence claim based on two theories of recovery – general negligence and negligence *per se*.  Plaintiff's FELA action arose out of a workplace accident where, *inter alia*, Plaintiff fell onto railroad tracks, a train owned by the Railroad ran over Plaintiff's legs and severely injured him, and Plaintiff's injuries resulted in multiple leg amputation surgeries.  The trial court's November 2022 judgment entered upon the jury's verdict awarded Plaintiff $12 million in damages and $15,204.23 in costs,[1] and the trial court's January 2023 amended judgment awarded Plaintiff post-judgment interest.  For the

---

[1] We note that the November 2022 judgment awarded Plaintiff costs against the Railroad but did not specify the amount.  Plaintiff subsequently filed a motion to assess taxable costs, which the trial court granted in the amount of $15,204.23 after holding a hearing.  For purposes of this appeal only and for simplicity, we refer to the November 2022 judgment as awarding Plaintiff $15,204.23 in costs.

reasons discussed below, we affirm the trial court's November 2022 judgment awarding Plaintiff $12 million in damages and $15,204.23 in costs, we reverse the trial court's January 2023 amended judgment awarding Plaintiff post-judgment interest, and we remand with instructions to the trial court to void its January 2023 amended judgment.

## I. BACKGROUND

**A. The Relevant Evidence Adduced at Plaintiff's Jury Trial[2]**

The following relevant evidence was adduced at Plaintiff's jury trial. The Railroad is a company incorporated in Missouri that hauls freight by rail in various states. Plaintiff began working for the Railroad in 2009 and his job duties included operating track switches to transport railcars. At the time of the April 14, 2020, workplace accident at issue in this case, Plaintiff was forty-five years old, and he had over twenty years of railroad experience.

**1. The Circumstances Leading Up to and Including the Workplace Accident**

On April 14, 2020, the Railroad assigned Plaintiff to work as a switchman with engineer B.F. ("Engineer B.F." or "B.F.") and conductor B.L. ("Conductor B.L." or "B.L."). They were instructed to drop off empty railcars at an industrial facility in Godfrey, Illinois, pick up loaded railcars, and return to the Railroad's home terminal via the main line. Conductor B.L. worked from the ground to separate and couple cars inside the facility's perimeter, while Plaintiff operated switches on the Railroad's track so Engineer B.F. could transport railcars over various tracks. Plaintiff remained near the track switch just outside the industrial facility's perimeter in full view of Engineer B.F., waiting for his co-workers to replace cars on the rear of the train.

The train consisted of the lead locomotive operated by Engineer B.F., a second locomotive attached to the lead, and railcars attached to the second locomotive and each other.

---

[2] "This Court reviews the evidence and reasonable inferences therefrom in [the] light most favorable to the jury's verdict." *Denney v. Syberg's Westport, Inc.*, 665 S.W.3d 348, 353 n.1 (Mo. App. E.D. 2023).

After the crew was finished replacing empty railcars with loaded railcars, B.L. instructed B.F. by radio to pull the railcars in Plaintiff's direction. Engineer B.F. looked out the train's front windshield and side window and saw Plaintiff standing on the right side of the track near the switch stand, and she knew Plaintiff may board the train as it moved towards and past him.

Engineer B.F. then drove the train forward a short distance and briefly stopped it to ensure the cars on the train were secure, and at this point she could no longer see Plaintiff. Conductor B.L. then instructed Engineer B.F. by radio to continue to drive the train forward.

In general accordance with the Railroad's practice and work method encouraging employees to get on and off moving equipment traveling at a walking speed of four miles per hour ("mph") or less,[3] Plaintiff prepared to board the second locomotive of the moving train and ride to the next switch, where he would disembark to manually line other switches for the train to return to the mainline.

As Engineer B.F. drove the train forward, Plaintiff stood away from the track between a switch and a posted sign identifying a derail[4] ("derail sign") near guidewires that secured an electrical pole. Although Plaintiff had a radio hooked onto his belt and he admitted he was taught to notify an engineer if he was attempting to board moving equipment when the engineer could not see him, he did not notify B.F. that he was going to attempt to board the train. Plaintiff testified the train speed was about three to four mph, i.e., "walking speed," when Plaintiff attempted to board the second locomotive of the moving train.[5]

Plaintiff watched the train move past him, then walked the unimpeded path between the switch and derail sign towards the track. Plaintiff reached out to grab the train ladder handrail of

---

[3] The Railroad's practice and work method encouraging employees to get on and off moving equipment is described in detail below in Section I.A.3. of this opinion.
[4] A derail diverts wayward railcars off the track.
[5] Similarly, Engineer B.F. testified she "assume[d]" the train was traveling at a "walking speed" when Plaintiff attempted to board it, in part because the train had just started back up after coming to a brief stop.

the second locomotive, stepped up, and as he pulled himself upward, Plaintiff felt the derail sign strike him, he fell to the ground, and the train ran over his legs. In her side view mirror, Engineer B.F. "saw [Plaintiff] rolling on the ground" after he fell and immediately stopped the train. Based on Engineer B.F.'s familiarity with the scene and her review of videos of the incident captured on cameras from the train and industrial facility, B.F. testified that she believed the derail sign caused Plaintiff to fall.[6] Plaintiff was subsequently airlifted to St. Louis for life saving treatment and later received multiple leg amputation surgeries.

2. **The Railroad's Post-Accident Conduct, the Railroad's Admitted Violations of an Illinois Regulation and its Own Internal Rules, and the Railroad's Failure to Train or Warn Employees Regarding Placement of Signs Posted Near Tracks**

One day after the workplace accident, and before the Federal Railroad Administration ("Federal Railroad Administration" or "FRA") and the Illinois Commerce Commission arrived to inspect the scene, the Railroad's "roadmaster" who managed track maintenance and structure, J.B. ("Manager J.B."), removed the entire derail sign (including its post) from the ground. Manager J.B. testified he removed the derail sign because it was "no longer needed" and because it was too close to the tracks in violation of an Illinois regulation and the Railroad's own internal standards regarding "close clearances such as [ ] derail sign[s]." Manager J.B. admitted: (1) the Railroad was responsible for inspecting and maintaining the track and should have known before the accident that the derail sign was too close to the tracks; and (2) the Railroad's failure to identify the "close clearance" of the derail sign involved in the workplace accident in this case violated its responsibility to provide safe working conditions. When Manager J.B. removed the derail sign near the tracks, he did not leave any trace that it had been there. Additionally, in

---

[6] As explained below in our discussion of the Railroad's third point on appeal in Section II.B. of this opinion, this testimony was admitted over the Railroad's objection and in the context of Plaintiff's counsel asking Engineer B.F. at trial about statements she made to the Railroad's attorneys before trial.

4

violation of the Railroad's internal rules, Manager J.B. failed to prepare an inspection report to document his removal of the derail sign.

Manager J.B. and a Railroad corporate representative both testified that the Railroad never notified the Federal Railroad Administration about the derail sign or that the Railroad had removed it. Similarly, the Railroad did not notify the Illinois Commerce Commission that Plaintiff's workplace accident involved the derail sign or that the Railroad had allowed the derail sign to be posted too close to the tracks.

The day after the workplace accident, Plaintiff called his manager M.C. ("Manager M.C.") to report how he was doing and to make sure the Railroad knew the derail sign had struck him. Manager M.C. emailed this information to other Railroad managers, and the Railroad's superintendent W.C. ("Superintendent W.C." or "W.C.") prepared a handwritten internal report documenting the workplace accident. Superintendent W.C. then prepared a typed-up version of the same form reporting the accident. Although W.C's handwritten internal report documented Plaintiff was struck by a fixed sign during the accident, the typed internal report omitted any reference to a sign striking Plaintiff. Superintendent W.C. sent both reports to M.V., the Railroad's regulatory reporting officer ("Officer M.V." or "M.V."), who used them in deciding what to report to the Federal Railroad Administration.[7] The Railroad never informed the FRA that its derail sign was posted too close to the railroad tracks or that the derail sign played any role in the workplace accident.[8]

---

[7] As explained below in our discussion of the Railroad's fourth point on appeal in Section II.C. of this opinion, Officer M.V. provided deposition testimony regarding one of the Railroad's internal reports and its monthly report to the Federal Railroad Administration documenting Plaintiff's workplace accident, and this testimony was admitted over the Railroad's objection.

[8] As explained below in our discussion of the Railroad's fifth point on appeal in Section II.D. of this opinion, the Railroad attempted to introduce a portion of Officer M.V.'s deposition testimony at trial regarding whether the Railroad verbally reported to the FRA that Plaintiff informed the Railroad he had been struck by a sign during his workplace accident, and the trial court excluded this evidence.

Moreover, the Railroad did not train transportation crews how to identify when signs were posted too close to the tracks. Additionally, the Railroad's track department was responsible for identifying and complying with state railroad clearance requirements yet failed to warn Plaintiff and his crew that the derail sign was too close to the tracks.

### 3. The Railroad's Practice and Work Method of Encouraging Workers to Get On and Off Moving Equipment

In 1995, about twenty-five years before Plaintiff's workplace accident, the Railroad had a rule generally prohibiting employees from getting on and off moving equipment because it created an unnecessary risk of injury.[9] However, the Railroad later revoked this rule and implemented a practice encouraging workers to get on and off moving equipment ("the Practice"). The Practice reduced transport times and increased profits. Over time, the Railroad increased the permissible speed of moving equipment for the Practice from two mph to three mph, and then to the permissible "walking speed" of "approximately [four] mph" which was in effect at the time of Plaintiff's accident. Plaintiff was aware of the Practice and was also taught to notify an engineer if he was attempting to board moving equipment when the engineer could not see him.

Before implementing the Practice, the Railroad did not conduct or identify any studies assessing hazards associated with it, even though other railroads had long-standing prohibitions against boarding moving equipment due to increased injury risks. Furthermore, B.O., who was Plaintiff's railroad operations expert and a former safety officer for another railroad, testified that the Practice was "inherently unsafe" and exposed workers to an increased risk of serious injuries.

---

[9] Two exceptions to this rule allowed Railroad employees to get on and off moving equipment "in cases of emergency" and when "instructed [to do so] by [a] superintendent's bulletin."

**4. Plaintiff's Medical Treatment and Future Needs**

After the workplace accident, Plaintiff had a total of ten surgeries including "guillotine" and revision amputation surgeries on his legs. Ultimately, Plaintiff's left leg was amputated above the knee, and Plaintiff's right leg was amputated below the knee. After an initial hospitalization of about two weeks, Plaintiff was transferred to an inpatient rehabilitation institute for several weeks to treat phantom nerve pain and depression and then had another hospitalization of about two weeks. Plaintiff subsequently underwent years of physical therapy and prosthetic training.

Plaintiff's trauma surgeon, Plaintiff's rehabilitation specialist, and Plaintiff's physical therapist collectively testified that: Plaintiff will likely experience phantom pain sensations and physical pain in his leg stumps for the rest of his life; Plaintiff has an increased risk of falling and an increased risk of needing future surgeries – including a surgery to amputate his right leg above the knee – as his muscles shrink as he ages; and Plaintiff's needs will include bi-annual follow-up visits, wheelchairs, walkers, household accommodations, prosthetics, prescription medication to treat phantom pain, and ongoing physical therapy.

Additionally, L.S. ("Nurse L.S. or "L.S."), a certified life care planner and registered nurse who had thirty years of experience at the time of Plaintiff's trial, collaborated with Plaintiff's treatment providers and a prosthetist to assess Plaintiff's lifetime healthcare needs. These needs included: doctor visits; medical equipment and supplies; home and vehicle modifications; prosthetics; medications; and physical therapy. Nurse L.S. testified Plaintiff's lifetime healthcare needs would cost a total of $3,284,933.92 to $3,880,938.54.

**B. The Relevant Procedural Posture**

After Plaintiff's workplace accident, Plaintiff filed a FELA action asserting a negligence claim against the Railroad based on two theories of recovery – general negligence and

negligence *per se*. Plaintiff's general negligence theory alleged Plaintiff's injuries were caused by, *inter alia*, the Railroad's failure to provide reasonably safe working conditions and the Railroad's failure to provide reasonably safe methods for work.

Plaintiff's negligence *per se* theory alleged Plaintiff's injuries were caused by, *inter alia*, the Railroad's failure to identify and eliminate the "close clearance" of the derail sign that struck Plaintiff, in violation of Illinois Administrative Code Title 92, section 1500.270 ("Illinois Code section 1500.270").[10] *See id.* (providing in relevant part that "[n]o part of any sign . . . attached to [] poles or posts shall be less than [eight] feet from the centerline of an adjacent track, between the top of rail and a point [fifteen] feet above"). At trial, the Railroad admitted the derail sign was about a foot and a half too close to the centerline of the track, in violation of Illinois Code section 1500.270 and the Railroad's internal track maintenance standards, which both require signs to be eight feet or more from the center of the adjacent track.[11] However, in its answer and at trial, the Railroad asserted: (1) the derail sign did not cause Plaintiff's fall and injuries; and (2) Plaintiff's contributory negligence as an affirmative defense to Plaintiff's general negligence and negligence *per se* theories because, *inter alia*, Plaintiff failed to notify Engineer B.F. that he was getting on the moving train.

A nine-day jury trial on Plaintiff's FELA action took place in October and November 2022. After the close of Plaintiff's evidence and at the close of all of the evidence, the trial court: (1) denied the Railroad's motions for a directed verdict; (2) submitted Plaintiff's proposed Instruction No. 8 over the Railroad's objection; and (3) submitted Plaintiff's proposed verdict

---

[10] All references to Illinois Code section 1500.270 are to the version of the code effective from December 15, 2005, to the present.

[11] During opening argument, counsel for the Railroad admitted "[t]he sign was too close." Additionally, during Railroad Manager J.B.'s video deposition testimony which was played for the jury at trial, he admitted that the derail sign was approximately a foot and a half too close to the track in violation of the Illinois Code section 1500.270 and the Railroad's internal track maintenance standards, which both require signs to be eight feet or more from the centerline of the adjacent track.

form over the Railroad's objection. Via these rulings, the trial court effectively found that although the Railroad was entitled to a contributory negligence defense on Plaintiff's general negligence theory, the Railroad was not entitled to such a defense on Plaintiff's negligence *per se* theory.

The jury subsequently entered a verdict finding for Plaintiff on both of his theories of recovery (general negligence and negligence *per se*) and assessed Plaintiff's total damages to be $12 million. On Plaintiff's general negligence theory, the jury found the Railroad 79% at fault and Plaintiff 21% at fault. Nevertheless, because the jury also found in favor of Plaintiff on his negligence *per se* theory, and because of the trial court's previous rulings finding that the Railroad was not entitled to a contributory negligence defense on this theory, the trial court entered a judgment on November 4, 2022 ("November 2022 judgment" or "November 2022 original judgment") awarding Plaintiff the total amount of $12 million in damages found by the jury.[12] The November 2022 judgment also awarded Plaintiff $15,204.23 in costs. *See* footnote 1 of this opinion.

After the trial court entered its November 2022 judgment, Plaintiff did not file any timely after-trial motions. However, the Railroad filed timely after-trial motions requesting a new trial or judgment notwithstanding the verdict ("JNOV") alleging the trial court committed multiple errors (many of which are raised in this appeal).

---

[12] "[A plaintiff's] separate theories of recovery for general and *per se* negligence constitute[] a single 'claim' seeking the same damages under [] FELA." *Host v. BNSF Railway Company*, 460 S.W.3d 87, 94, 98 (Mo. App. W.D. 2015). Although both theories seek recovery for the same damages, the theory of general negligence is subject to a defense of contributory negligence, but a theory of negligence *per se* is not subject to such a defense if, *inter alia*, a railroad violates "any statute enacted for the safety of employees" and the violation "contributed to the injury or death of [a plaintiff-employee]." *Id.*; 45 U.S.C. section 53 (effective from April 22, 1908, to the present); *see also O'Malley v. Public Belt Railroad Commission for City of New Orleans*, 334 F.Supp.3d 811, 815, 815 n.18 (E.D. La. 2018). Whether the Railroad was entitled to a defense of contributory negligence on Plaintiff's negligence *per se* theory in this case will be discussed in detail below in Section II.A. of this opinion.

The trial court entered an order denying the Railroad's after-trial motions on January 12, 2023. On January 20, 2023, Plaintiff filed a motion to amend the November 2022 judgment to award post-judgment interest. On that same date: (1) the Railroad filed a motion in opposition to Plaintiff's motion to amend on the grounds the trial court lacked jurisdiction to amend the November 2022 judgment; (2) the Railroad filed a notice of appeal asserting it was appealing the November 2022 judgment; and (3) the trial court entered an amended judgment awarding Plaintiff post-judgment interest ("January 2023 amended judgment"). Subsequently, the Railroad filed an amended notice of appeal challenging the January 2023 amended judgment. The case was then briefed, orally argued, and submitted to this Court.[13]

The Railroad raises a total of eight points on appeal. The Railroad's first seven points on appeal argue the trial court's November 2022 judgment awarding Plaintiff damages and costs is erroneous. The Railroad's eighth point on appeal asserts the trial court's January 2023 amended judgment awarding Plaintiff post-judgment interest is erroneous.

## II. DISCUSSION OF THE RAILROAD'S FIRST SEVEN POINTS ON APPEAL

The Railroad's first seven points on appeal argue respectively that the trial court's November 2022 judgment awarding Plaintiff damages and costs is erroneous because: (1)-(2) the trial court erred in finding the Railroad was not entitled to a contributory negligence defense on Plaintiff's negligence *per se* theory; (3) the trial court erred in permitting Plaintiff's counsel to ask Engineer B.F. about statements she made to the Railroad's attorneys before trial because the statements were protected by attorney-client privilege; (4) the trial court erred in admitting portions of Officer M.V.'s video deposition testimony regarding one of the Railroad's internal reports and the Railroad's monthly report to the Federal Railroad Administration documenting

---

[13] To avoid unnecessary repetition, additional facts and procedural posture relevant to each of the Railroad's points on appeal will be set forth in Sections II.A-F. and Section III. of this opinion.

Plaintiff's workplace accident; (5) the trial court erred in excluding a portion of Officer M.V.'s video deposition testimony regarding whether the Railroad verbally reported to the FRA that Plaintiff informed the Railroad he had been struck by a sign during his workplace accident; (6) the trial court erred in admitting a portion of Superintendent W.C.'s video deposition testimony at trial because the testimony played for the jury improperly omitted a special master's question and an exchange between W.C. and the special master; and (7) the trial court committed reversible error in admitting two exhibits prepared by Nurse L.S. because the exhibits constituted inadmissible hearsay and allegedly prejudiced the Railroad because the exhibits were given to the jury during deliberations.

**A.     Whether the Trial Court Erred in Finding the Railroad Was Not Entitled to a Contributory Negligence Defense on Plaintiff's Negligence *Per se* Theory**

The Railroad's first and second points on appeal argue the trial court erred in finding the Railroad was not entitled to a contributory negligence defense[14] on Plaintiff's negligence *per se* theory.  The specific rulings challenged in this point include: the trial court's denial of the Railroad's motions for a directed verdict; the court's denial of the Railroad's after-trial motion requesting a JNOV; the court's submission of Instruction No. 8 over the Railroad's objection; and the court's submission of the verdict form over the Railroad's objection.  It is undisputed the Railroad's challenges to these rulings are preserved for appeal.

**1.     The Relevant Standard of Review, the Relevant Law, and this Court's Interpretation of the Applicable Federal Statutes**

The issue involved in this point on appeal – whether the trial court erred in finding the Railroad was not entitled to a contributory negligence defense on Plaintiff's negligence *per se*

---

[14] The concept that a defendant should be entitled to a defense asserting "[a] reduction in a plaintiff's damages in proportion to his fault is often referred to as 'comparative fault,'[;] however[,] [] FELA . . . refer[s] to this concept as 'contributory negligence.'" *Miller v. Norfolk Southern Railway Company*, 591 S.W.3d 29, 43 n.17 (Mo. App. W.D. 2019).  Accordingly, we refer to the concept as "contributory negligence" in this case. *See id*.

11

theory – involves interpretation of 45 U.S.C. section 53 (individually "section 53")[15] and 45 U.S.C. section 54a (individually "section 54a")[16] (collectively "sections 53 and 54a"). Statutory interpretation raises a question of law requiring *de novo* review.[17] *Luman v. ITS Technologies & Logistics, LLC*, 323 S.W.3d 821, 824 (Mo. App. W.D. 2010). "[T]he primary rule of statutory interpretation is to give effect to legislative intent as reflected in the plain language of the statute at issue." *Collector of Winchester v. Charter Communications, Inc.*, 660 S.W.3d 405, 415-16 (Mo. App. E.D. 2022) (citation and internal quotations omitted).

Section 53 provides in relevant part:

> In all actions on and after April 22, 1908 brought against any such common carrier by railroad under or by virtue of any of the provisions of this chapter to recover damages for personal injuries to an employee, or where such injuries have resulted in his death . . . no such employee who may be injured or killed shall be held to have been guilty of contributory negligence in any case where the violation by such common carrier of *any statute enacted for the safety of employees* contributed to the injury or death of such employee.

(emphasis added). Shortly after the enactment of section 53 in 1908, the U.S. Supreme Court interpreted the language "any statute enacted for the safety of employees" in section 53 to mean any *federal* safety statute and to exclude all state laws and regulations. *Seaboard Air Line Ry. v. Horton*, 233 U.S. 492, 503 (1914); *see also* section 53. Many decades later, however, section 54a was enacted, providing that some state laws and regulations are to be considered a "statute enacted for the safety of employees" under section 53. *See* section 54a. Section 54a specifically states:

---

[15] All references to section 53 are to the version of the statute effective from April 22, 1908, to the present.
[16] All references to section 54a are to the version of the statute effective from July 5, 1994, to the present.
[17] Similarly, the rulings challenged in this point – alleged instructional error based on a matter of law and the denial of motions for directed verdict and JNOV based on a matter of law – raise questions of law requiring *de novo* review. *Hollis by & Through Hollis v. Poplar Bluff Regional Medical Center, LLC*, 674 S.W.3d 76, 85 (Mo. App. E.D. 2023) ("[w]hether the jury was properly instructed is a question of law that is reviewed *de novo*") (citations omitted and emphasis added); *Trinity Lutheran Church v. Lipps*, 68 S.W.3d 552, 557 (Mo. App. E.D. 2001) ("[w]hen the . . . denial of a directed verdict or a JNOV is based upon a matter of law . . . we review the trial court's decision *de novo*).

*A regulation, standard, or requirement* in force, or *prescribed* by the Secretary of Transportation under chapter 201 of Title 49 or *by a State agency that is participating in investigative and surveillance activities under section 20105 of Title 49,*[18] *is deemed to be a statute under section*s 53 and 54 of this title.

(emphasis added).

Based on the plain language of sections 53 and 54a, we hold the language "any statute enacted for the safety of employees" in section 53 does not just encompass any federal safety statute but also encompasses "any" "regulation, standard or requirement . . . prescribed . . . by a State agency that is participating in investigative and surveillance activities under section 20105 of Title 49" as provided in section 54a. *See id.*; section 53; *see also Schipper v. BNSF Ry. Co.*, No. 07-2249-JWL, 2008 WL 2783160, at \*9 (D. Kan. July 16, 2008) ("[s]ection 54a expands the plain meaning of 'statute' in section[] 53"). We emphasize section 54a only requires "a State agency that is participating in investigative and surveillance activities under section 20105 of Title 49" to have "prescribed" "[a] regulation, standard or requirement" in order for the agency's regulation, standard, or requirement to be "deemed . . . a statute under section[] 53." Section 54a. Moreover, we find nothing in the plain language of section 54a which requires the State agency to be participating in any particular investigative and surveillance activities under section 20105 of Title 49 in order for its regulation, standard, or requirement to be deemed a statute under section 53. *See* section 54a. To hold otherwise would "add . . . words [to section 54a and] ignore the plain meaning of the words that are there." *See Dickemann v. Costco Wholesale*

---

[18] All references to section 20105 of Title 49, which is also referred to as 49 U.S.C. section 20105, are to the version of the statute effective from November 25, 2002, to the present. Section 20105(a) of Title 49, titled "[i]nvestigative and surveillance activities," states:

> The Secretary [of Transportation] concerned may prescribe investigative and surveillance activities necessary to enforce the safety regulations prescribed and orders issued by the Secretary that apply to railroad equipment, facilities, rolling stock, and operations in a State. The State may participate in those activities when the safety practices for railroad equipment, facilities, rolling stock, and operations in the State are regulated by a State authority and the authority submits to the Secretary concerned an annual certification as provided in subsection (b) of this section.

(emphasis and internal footnote omitted).

*Corporation*, 550 S.W.3d 65, 68 n.5 (Mo. banc 2018) (in determining the plain and ordinary meaning of statutory language, an appellate court is not authorized "to add or subtract words from a statute or ignore the plain meaning of the words that are there"); *see also* section 54a.

Accordingly, and as relevant to this case, we hold a common carrier railroad is not entitled to a contributory negligence defense if: (1) it violates "any" "regulation, standard or requirement . . . prescribed . . . by a State agency"; (2) the violated regulation, standard, or requirement was "enacted for the safety of employees"; (3) the violation of the regulation, standard or requirement "contributed to the injury . . . of [an] employee"; and (4) "[the] State agency . . . is participating in investigative and surveillance activities under section 20105 of Title 49" (collectively "four statutory requirements for barring a contributory negligence defense"). *See* sections 53 and 54a.

2. **Analysis as to Whether the Railroad Was Barred From Asserting a Contributory Negligence Defense in this Case**

In this case, each of the above four statutory requirements for barring a contributory negligence defense for the Railroad were met. First, the Railroad violated a regulation prescribed by a State agency. Plaintiff's negligence *per se* theory alleged Plaintiff's injuries were caused by, *inter alia*, the Railroad's failure to identify and eliminate the "close clearance" of the derail sign that struck Plaintiff, in violation of Illinois Code section 1500.270 which was prescribed by the Illinois Commerce Commission. *See id*. (providing in relevant part that "[n]o part of any sign . . . attached to [] poles or posts shall be less than [eight] feet from the centerline of an adjacent track, between the top of rail and a point [fifteen] feet above"). Notably, the Railroad admitted at trial that the derail sign which struck Plaintiff was about a foot and a half too close to the centerline of the track in violation of Illinois Code section 1500.270.

The second statutory requirement for barring a contributory negligence defense, i.e., whether Illinois Code section 1500.270 was enacted for the safety of employees, was also met. Illinois Code section 1500.270 addresses the subject of "[t]rack [c]learance" and prescribes railroad clearance dimensions relating to certain signs near railroad tracks. *See id*.; *see also* U.S. Department of Transportation Federal Railroad Administration, Track Frequently Asked Questions," https://railroads.dot.gov/divisions/track/track-frequently-asked-questions (choose "Track Clearances" from dropdown; then see answer to the question, "Are there any minimum distance requirements between railroad tracks and structures . . . ?") (last visited August 6, 2024). "[F]ederal and state case law recognize that state track clearance provisions are designed to protect railroad workers by providing them with sufficient work space[.]" *Tyrrell v. Norfolk Southern Ry. Co.*, 248 F.3d 517, 523-24 (6th Cir. 2001).[19]

Furthermore, the third statutory requirement for barring a contributory negligence defense was met because there was sufficient evidence adduced at trial that the Railroad's admitted violation of Illinois Code section 1500.270 (having the derail sign about a foot and a half too close to the centerline of the track) contributed to the injury of employee-Plaintiff. When Plaintiff was attempting to board the second locomotive of the train while working for the Railroad, he felt the derail sign strike him, he fell to the ground, and the train ran over his legs. Additionally, based on Engineer B.F.'s familiarity with the scene and her review of videos of the incident captured on cameras from the train and industrial facility, B.F. testified that she believed

---

[19] *Tyrrell* cites to the following federal and state case law: *Southern Pacific Transp. Co. v. Public Utilities Com'n of State of Cal.*, 647 F.Supp. 1220, 1222 (N.D. Cal. 1986), *aff'd*, 820 F.2d 1111 (9th Cir. 1987) (per curiam); *Brown v. Cedar Rapids and Iowa City Ry. Co.*, 650 F.2d 159, 163 (8th Cir. 1981); *United Transp. Union v. Department of Transp.*, 355 N.W.2d 683, 685 (Mich. App. 1984); and *Reading Co. v. Pennsylvania Public Utility Commission*, 146 A.2d 746, 748 (Pa. Super. Ct. 1958). *Tyrrell*, 248 F.3d at 523-24, 524 n.3.

the derail sign caused Plaintiff to fall.[20]  Moreover, after Plaintiff's fall, he was airlifted to St. Louis for life saving treatment and subsequently received multiple leg amputation surgeries.

Finally, the fourth statutory requirement for barring a contributory negligence defense was met because the Railroad concedes on appeal that the Illinois Commerce Commission participates in investigative and surveillance activities under section 20105 of Title 49.

In sum, the Railroad was not entitled to a contributory negligence defense on Plaintiff's negligence *per se* theory because: (1) the Railroad violated Illinois Code section 1500.270, which is a regulation prescribed by the Illinois Commerce Commission, a State agency; (2) Illinois Code section 1500.270 was enacted for the safety of employees; (3) the violation of Illinois Code section 1500.270 contributed to the injury of employee-Plaintiff; and (4) the Illinois Commerce Commission participates in investigative and surveillance activities under section 20105 of Title 49.  *See* sections 53 and 54a.

### 3. The Railroad's Argument on Appeal and Reliance on the Seventh Circuit Decision in *Fletcher v. Chicago Rail Link, L.L.C.*

On appeal, the Railroad argues it was entitled to a contributory negligence defense on Plaintiff's negligence *per se* theory because Illinois Code section 1500.270 does not support or implement federal safety norms in that: (1) there is allegedly "no federal statute relating to close clearances or any instruction by [the] FRA on implementation of state close clearance laws"; and (2) "Illinois [allegedly] does not investigate or enforce any clearance laws on behalf of the federal government or report any violations of same to any federal agency."  In support of this argument, the Railroad primarily relies on the Seventh Circuit decision in *Fletcher v. Chicago Rail Link, L.L.C.*, which held in relevant part that sections 53 and 54a only bar a Railroad from pursuing a contributory negligence defense on a plaintiff's theory of recovery relating to a

---

[20] As explained below in our discussion of the Railroad's third point on appeal in Section II.B. of this opinion, the Railroad challenges the admission of this testimony, and we find the trial court did not err in admitting it.

violation of a state law or regulation when the law or regulation at issue supports or implements federal safety norms. 568 F.3d 638, 639-40 (7th Cir. 2009). For the reasons discussed below, we find the Railroad's reliance on *Fletcher* is misplaced.

Importantly, we are not bound to follow the Seventh Circuit's decision in *Fletcher* because this Court is only bound by controlling and applicable decisions from the U.S. Supreme Court and the Missouri Supreme Court. *See Cook v. Parkland Health Center*, 674 S.W.3d 65, 72 (Mo. App. E.D. 2023*)* (holding our Court is bound by Missouri Supreme Court decisions); *Foltz v. Burlington Northern R. Co.*, 689 S.W.2d 710, 712, 716-17 (Mo. App. W.D. 1985) (FELA case holding our Court is bound by U.S. Supreme Court decisions); *see also Wilson v. Union Pacific Railroad Company*, 509 S.W.3d 862, 866, 871 (Mo. App. E.D. 2017) (FELA case holding "this Court is not bound by precedent from the Eighth Circuit"). Furthermore, although it would be permissible for this Court to rely on *Fletcher* as persuasive or instructive authority, we decline to do so because we find its holding is contrary to the plain language of sections 53 and 54a discussed above in Section II.A.1. of this opinion.

Our finding that the *Fletcher* decision is contrary to the plain language of sections 53 and 54a is the most important and primary reason why we decline to rely on *Fletcher* as persuasive or instructive authority. Nevertheless, there is an additional reason why this Court declines to rely on *Fletcher*. *Fletcher* attaches significance to how its holding is consistent with "Congress's determination that 'laws, regulations, and orders related to railroad safety . . . shall be nationally uniform to the extent practicable.'" 568 F.3d at 640 (citing 49 U.S.C. section 20106(a)(1)) (effective from August 3, 2007, to the present). However, the U.S. Supreme Court has held that "[a] concern with uniformity does not justify the displacement of state common-law remedies that compensate accident victims and their families and that serve [a] [federal] [a]ct's more prominent objective . . . of promoting [] safety." *Sprietsma v. Mercury Marine, a Div. of*

17

*Brunswick Corp.*, 537 U.S. 51, 70 (2002). Importantly, "[] FELA is a broad remedial statute that must be liberally construed to further its humanitarian goal of holding railroads . . . responsible for the dangers to which their employees are exposed." *Duncan v. American Commercial Barge Line, LLC*, 166 S.W.3d 78, 83 (Mo. App. E.D. 2004) (citing *Urie v. Thompson*, 337 U.S. 163, 180 (1949)).

Accordingly, we find *Fletcher* is misguided to the extent it elevates the goal of uniformity over FELA's prominent objective of promoting safety and holding railroads responsible for the dangers to which their employees are exposed, especially where, as here, a Railroad admits it violated a state regulation which was enacted for the safety of its employees. *See Sprietsma*, 537 U.S. at 70; *Duncan*, 166 S.W.3d at 83 (citing *Urie*, 337 U.S. at 180).

### 4. Conclusion as to the Railroad's First and Second Points on Appeal

Based on the foregoing, the trial court did not err in finding the Railroad was not entitled to a contributory negligence defense on Plaintiff's negligence *per se* theory. The Railroad's first and second points on appeal are denied.

### B. Whether the Trial Court Erred in Permitting Plaintiff's Counsel to Ask Engineer B.F. About Statements She Made to the Railroad's Attorneys Before Trial

In the Railroad's third point on appeal, it contends the trial court erred in permitting Plaintiff's counsel to ask Engineer B.F. about statements she made to the Railroad's attorneys before trial because the statements were protected by attorney-client privilege. For the reasons discussed below, we disagree.

### 1. The Relevant Procedural Posture

During Plaintiff's counsel's direct examination of Engineer B.F. at trial, counsel asked B.F., "[D]id you have an opportunity before trial today to be called into the [R]ailroad's lawyers' offices to talk to them . . .?" Counsel for the Railroad objected on the grounds that any

statements Engineer B.F. made to the Railroad's attorneys before trial were protected by attorney-client privilege. B.F. was briefly questioned by Plaintiff's counsel in the presence of the jury and then she was questioned by both parties during an offer of proof outside the presence of the jury. Ultimately, conflicting evidence was adduced as to whether B.F. had an attorney-client relationship with Railroad's counsel.[21] The trial court then overruled the Railroad's objection and allowed the Railroad to have a continuing objection to the challenged line of questioning.

The jury was brought back into the courtroom, and Plaintiff's counsel continued his direct examination of Engineer B.F. In response to questions from Plaintiff's counsel, B.F. testified that when she met with the Railroad's attorneys before trial, she reviewed videos from the train and industrial facility that were taken near the time of Plaintiff's workplace accident. B.F. also testified she told the Railroad's attorneys that based on her review of the videos and her familiarity with the scene, she believed the derail sign caused Plaintiff to fall. The videos were admitted into evidence at trial without objection, the videos were played for the jury, and B.F. testified about what they showed.

After the conclusion of Engineer B.F.'s testimony, proceedings were again held outside the presence of the jury. Counsel for the Railroad moved for a mistrial on the basis that B.F.'s statements to the Railroad's attorneys before trial were protected by attorney-client privilege because: (1) B.F. and Railroad's counsel had an attorney-client relationship; and (2) the Railroad and its counsel had an attorney-client relationship and B.F.'s acts or omissions near the time of Plaintiff's accident could be imputed to the Railroad. The trial court denied the Railroad's request for a mistrial, explicitly finding it did not believe there was an attorney-client

---

[21] This conflicting evidence will be set out in detail below in Section II.B.3.a. of this opinion.

relationship between B.F. and Railroad's counsel.[22]  The court also found Plaintiff's theory of the case was not attempting to impute any of B.F.'s acts or omissions to the Railroad.

###    2.    The Relevant Standard of Review and General Law

It is undisputed the Railroad's claim at issue in this point – that the trial court erred in permitting Plaintiff's counsel to ask Engineer B.F. about statements she made to the Railroad's attorneys before trial because the statements were protected by attorney client privilege – is preserved for appeal.  Because this point involves an evidentiary ruling (the admission of evidence) and the application of a legal issue to the factual circumstances of this case (whether attorney-client privilege protected B.F.'s statements), multiple standards of review are implicated.

An appellate court reviews a challenge to a trial court's admission of evidence for an abuse of discretion.  *Dash v. Taylor*, 668 S.W.3d 580, 588 (Mo. App. E.D. 2023); *see also DeLaporte v. Robey Bldg. Supply, Inc.*, 812 S.W.2d 526, 531 (Mo. App. E.D. 1991) (applying an abuse of discretion standard of review to the admission of evidence which, as in this case, was allegedly protected by attorney-client privilege).  An abuse of discretion occurs when the trial court's decision "is clearly against the logic of the circumstances and is so unreasonable as to indicate a lack of careful consideration."  *Dash*, 668 S.W.3d at 588 (citation omitted).

Our Court defers to the trial court's explicit and implicit credibility determinations and factual findings relating to an evidentiary ruling.  *State v. Burroughs*, 627 S.W.3d 69, 75 (Mo. App. E.D. 2021); *State v. Hooper*, 552 S.W.3d 123, 129 (Mo. App. S.D. 2018); *Boroughf v. Bank of America, N.A.*, 159 S.W.3d 498, 504-05 (Mo. App. S.D. 2005); *see also State v. Taylor*, 298 S.W.3d 482, 492 n.4 (Mo. banc 2009).  However, our review is *de novo* as to the trial court's application of the law to its factual findings.  *Hooper*, 552 S.W.3d at 129; *see also Taylor*, 298

---

[22] The trial court's detailed findings will be set out in detail below in Section II.B.3.a. of this opinion.

S.W.3d at 492 n.4. As relevant here, questions of whether the factual circumstances of a particular case give rise to an attorney-client relationship or the existence of attorney-client privilege present issues of law implicating *de novo* review. *Id.*; *Pipes v. Sevier*, 694 S.W.2d 918, 925-26 (Mo. App. W.D. 1985).

"The party asserting attorney-client privilege bears the burden of proof to demonstrate that the privilege applies." *State ex rel. Koster v. Cain*, 383 S.W.3d 105, 116 (Mo. App. W.D. 2012) (citing *State ex rel. Ford Motor Co. v. Westbrooke*, 151 S.W.3d 364, 367 (Mo. banc 2004)). Under the attorney-client privilege doctrine, which the Missouri Supreme Court has described as "broad," "[a] client has a privilege to refuse to disclose, and to prevent others from disclosing, confidential communications between [her]self or h[er] representative and h[er] lawyer or h[er] representative." *State ex rel. Great American Ins. Co. v. Smith*, 574 S.W.2d 379, 383, 384 (Mo. banc 1978); *McCaffrey v. Brennan's Estate*, 533 S.W.2d 264, 267 (Mo. App. 1976). Furthermore, "when a communication meets all the legal requirements entitling it to be privileged when made directly between an attorney and his client, it is equally privileged when the communication is made through the client's agent or employee." *McCaffrey*, 533 S.W.2d at 267 (citation omitted). In other words, an individual's communication with counsel is protected by attorney-client privilege if she herself has an attorney-client relationship with counsel or if the corporation she works for has an attorney-client relationship with counsel, *if* the communication meets all the legal requirements entitling it to be privileged. *Id.*; *see also Cain*, 383 S.W.3d at 116; *DeLaporte*, 812 S.W.2d at 531.

### 3. Analysis as to the Railroad's Arguments that B.F.'s Statements to Railroad's Counsel Were Protected by Attorney-Client Privilege

In this case, the Railroad challenges the admission of Engineer B.F.'s pre-trial statements in which she told the Railroad's attorneys that based on her review of the videos and her

familiarity with the scene, she believed the derail sign caused Plaintiff to fall. The Railroad argues these statements were protected by attorney-client privilege: (a) by virtue of B.F.'s attorney-client relationship with Railroad's counsel; and (b) by virtue of the Railroad's attorney-client relationship with counsel.

### a. Whether B.F.'s Statements to Railroad's Counsel Were Protected by Virtue of Her Alleged Attorney-Client Relationship with Counsel

In determining whether an individual's communication is protected by attorney-client privilege by virtue of her alleged attorney-client relationship, the party asserting the privilege applies has the burden of showing: (1) an attorney-client relationship existed at the time the challenged communication was made; and (2) "the attorney-client relationship existed with respect to the subject matter of the communication." *Cain*, 383 S.W.3d at 116. "An attorney-client relationship is sufficiently established when the advice and assistance of the attorney is sought and received in matters pertinent to her profession." *McFadden v. State*, 256 S.W.3d 103, 106 (Mo. banc 2008) (citation and internal quotations omitted) (abrogated on other grounds).

In this case, whether an attorney-client relationship existed between B.F. and Railroad's counsel was disputed and a question of fact because conflicting evidence was adduced on the issue. *See id.* (acknowledging that while parties usually agree as to whether an attorney-client relationship exists, in some cases its existence may be disputed and a question of fact).

On the one hand, some evidence was presented which would support a finding that B.F. did not have an attorney-client relationship with Railroad's counsel. In particular, when Plaintiff's counsel asked B.F., "[H]ave you hired the[] [R]ailroad['s] lawyers to represent you for anything?" she responded, "I have not hired anybody." Additionally, B.F. answered, "[n]o" in response to questions from Plaintiff's counsel asking her: if she had "signed any kind of a written agreement that Husch Blackwell is representing [her]"; if she "ever reach[ed] out to them and

22

sa[id], . . . [']I feel like I need to have a lawyer represent me[']"; and if she "ever [went] to them and sa[id], [']I want you to represent me[']."

On the other hand, evidence was adduced supporting a finding that B.F. had an attorney-client relationship with Railroad's counsel. Specifically, B.F. answered, "[y]es," in response to questions from Railroad's counsel asking her: if she "met with [the Railroad's attorneys before trial] multiple times to discuss this case"; if "[i]n those meetings, [] [she] underst[ood] that [the Railroad's attorneys were] representing [her] in this case"; and if it was "[her] understanding that those [meetings] were protected by attorney-client privilege." Additionally, when Railroad's counsel's asked B.F., "So do you view us as your attorneys in this matter, Husch Blackwell?" B.F. responded, "Yes, I would guess so."

In denying the Railroad relief at trial, the trial court acknowledged the conflicting evidence and specifically found it did not believe there was an attorney-client relationship between B.F. and Railroad's counsel:

> [During Plaintiff's examination of B.F.,] [B.F.] testified that she did not hire any attorney. Does not want any attorney. And then [during Railroad's counsel's examination of B.F.], it was an understanding during [Railroad's counsel's] conversation with her, that [counsel] tried to convince her that [the Railroad's attorneys] were[] her attorney[s].

> It didn't appear to me that there was any attorney-client relationship between [the Railroad's attorneys] and [B.F.].

The trial court's findings are supported by the record, and we defer to the trial court's factual findings and related credibility determinations that an attorney-client relationship did not exist between Engineer B.F. and Railroad's counsel at the time her challenged communication was made before trial. *See Burroughs*, 627 S.W.3d at 75; *Hooper*, 552 S.W.3d at 129; *Boroughf*, 159 S.W.3d at 504-05; *see also Taylor*, 298 S.W.3d at 492 n.4; *McFadden*, 256 S.W.3d at 106; *Cain*, 383 S.W.3d at 116. Moreover, because the Railroad failed to meet its burden of showing

23

the existence of an attorney-client relationship between B.F. and Railroad's counsel at the time the challenged communication was made, the Railroad's claim that B.F.'s communication with Railroad's counsel was protected by attorney-client privilege by virtue of her alleged attorney-client relationship with counsel has no merit. *See Cain*, 383 S.W.3d at 116.

### b. Whether B.F.'s Statements to Railroad's Counsel Were Protected by Virtue of the Railroad's Attorney-Client Relationship with Counsel

A corporation's attorney-client privilege "covers counsel's communications with both top management and lower level employees." *DeLaporte*, 812 S.W.2d at 531 (citing *Commodity Futures Trading Com'n v. Weintraub,* 471 U.S. 343, 348 (1985)). In this case, it is undisputed that B.F. was a lower level employee of the Railroad. In order for the Railroad to demonstrate it has an attorney-client privilege which covers a communication between its counsel and B.F. as a lower level employee, it must show, *inter alia*:

> (1) the communication was made for the purpose of securing legal advice; (2) [B.F.,] the employee making the communication[,] did so at the direction of [her] corporate superior; (3) the superior made the request so that the corporation could secure legal advice; (4) the subject matter of the communication is within the scope of [B.F.'s] corporate duties; and (5) the communication is not disseminated beyond those persons who, because of the corporate structure, need to know its contents.[23]

*See DeLaporte*, 812 S.W.2d at 531 (quoting *Diversified Industries, Inc. v. Meredith*, 572 F.2d 596, 608-09 (8th Cir. 1978)); *see also Cain*, 383 S.W.3d at 116.

In this case, we hold the Railroad has failed to show element (2) set out above, i.e., that Engineer B.F. made the statements challenged in this appeal at the direction of her corporate superior. The record only shows B.F. talked to the Railroad's lawyers before trial because she was "called into the [R]ailroad's lawyers' offices." The Railroad has failed to cite to any

---

[23] Like any party asserting attorney-client privilege protects a communication, the Railroad as a corporation also must show an attorney-client relationship existed at the time the challenged communication was made and that "the attorney-client relationship existed with respect to the subject matter of the communication." *Cain*, 383 S.W.3d at 116; *see also* Section II.B.3.a. of this opinion. We find the Railroad met its burden of showing these elements for purposes of this appeal only.

controlling legal authority supporting a finding that this scant and vague evidence is sufficient to meet its burden of showing that Engineer B.F.'s communications with the Railroad's lawyers at issue in this case were made at the direction of her corporate superior, and this Court can find no such legal authority.[24] *See id.*; *cf. Upjohn Co. v. U.S.*, 449 U.S. 383, 386-87, 394 (1981) (finding employees made communications to a corporation's counsel at the direction of their corporate superior for purposes of attorney-client privilege where, *unlike the circumstances of this case*, the chairman of the corporation signed a letter requesting the employees to answer questions for an internal legal investigation of "questionable payments" to foreign governmental officials). Under these circumstances, the Railroad's claim that B.F.'s communication with Railroad's counsel was protected by attorney-client privilege by virtue of the Railroad's attorney-client relationship with its counsel has no merit. *See id*.

### 4.     Conclusion as to the Railroad's Third Point on Appeal

Based on the foregoing, we hold the trial court did not err in in permitting Plaintiff's counsel to ask Engineer B.F. about statements she made to the Railroad's attorneys before trial. The Railroad's third point on appeal is denied.

---

[24] In its reply brief, the Railroad argues it has met its burden of showing that Engineer B.F.'s communications with the Railroad's lawyers were made at the direction of her corporate superior because B.F.'s communications were within the scope of her employment under the circumstances of this case (in that she was the engineer at the time of Plaintiff's workplace accident and talking to the Railroad's lawyers was in the Railroad's interests and allegedly arose out of the performance of B.F.'s duties). In support of its argument, the Railroad cites to only one case – *Dibrill v. Normandy Associates, Inc.*, 383 S.W.3d 77 (Mo. App. E.D. 2012). *See id*. at 89-90 (providing "[a]n act is within the course and scope of employment if: (1) even though not specifically authorized, it is done to further the business or interests of the employer under his 'general authority and direction' and (2) it naturally arises from the performance of the employer's work") (citation omitted). The Railroad's reliance on this case is misplaced. *Dibrill*'s holding cited by the Railroad involves the doctrine of *respondeat superior*, *see id*., which is not at issue here because, *inter alia*, it is undisputed on appeal that Plaintiff's theory of the case did not attempt to impute any of B.F.'s acts or omissions to the Railroad. Additionally, no part of *Dibrill* discusses the legal issues implicated in this point on appeal (the doctrine of attorney-client privilege and the elements that a corporation has to show in order to demonstrate communications made by a lower level employee are protected under the doctrine). *See id*. at 81-92. Therefore, the Railroad's argument raised in its reply brief has no merit.

**C.** **Whether the Trial Court Erred in Admitting Portions of Officer M.V.'s Video Deposition Testimony**

In the Railroad's fourth point on appeal, it asserts the trial court erred in admitting portions of Officer M.V.'s video deposition testimony regarding one of the Railroad's internal reports and the Railroad's monthly report to the Federal Railroad Administration documenting Plaintiff's workplace accident. The Railroad contends such testimony was inadmissible because it was privileged pursuant to 49 U.S.C. section 20901(a) (individually "section 20901(a)") and 49 U.S.C. section 20903 (individually "section 20903") (collectively "sections 20901(a) and 20903").[25] For the reasons discussed below, we disagree.

**1.** **The Relevant Evidence and Procedural Posture**

In this case, Railroad employees prepared three internal reports documenting Plaintiff's workplace accident: (1) a handwritten report reflecting information that Plaintiff told his Manager M.C. about the accident ("handwritten internal accident report"); (2) a typed-up version of the same form ("typed internal accident report"); and (3) Form F618.98, which documented the Railroad's preliminary report of Plaintiff's accident ("internal Form 98 report").

Railroad Superintendent W.C. sent the handwritten internal accident report and typed internal accident report to Officer M.V., the Railroad's regulatory reporting officer and a Railroad corporate representative at trial. M.V. used the reports to prepare the internal Form 98 report and in deciding what to report to the FRA in a monthly report that the Railroad was required to file. Although the handwritten internal accident report stated Plaintiff was struck by a fixed sign during the accident as Plaintiff reported to his Manager M.C., the typed internal accident report omitted any reference to a sign striking Plaintiff. Similarly, over the objection of

---

[25] All references to sections 20901(a) and 20903 are to the versions of the statutes effective from July 5, 1994, to the present.

26

Railroad's counsel, Officer M.V. testified in her deposition that the internal Form 98 report omitted any reference to a sign striking Plaintiff.

In addition, over the objection of Railroad's counsel, Plaintiff's counsel asked M.V., who had personal knowledge about the information in the monthly report to the FRA because it was prepared by her department, about statements and omissions in the report:

> [Plaintiff's counsel]: Despite having the information from [the handwritten internal accident report] . . . which [ ] report[ed] that [Plaintiff] was injured when he was knocked off a moving train by a fixed sign, there's nothing in [the Railroad's] documentation that it prepared and submitted to the FRA that would have informed the FRA of that fact[?]
>
> . . .
>
> [Officer M.V.]: . . . [T]hat is correct.
>
> [Plaintiff's counsel]: Instead, what your department reported was no proximate cause or probable reason was known, correct?
>
> [Officer M.V.]: . . . [T]hat's correct . . ..
>
> [Plaintiff's counsel]: . . . And in the documentation that [the Railroad] prepared for submission to the FRA, it told the FRA that it had not determined what the probable reason for that incident was, correct?
>
> [Officer M.V.]: Correct.

Plaintiff's counsel also elicited testimony from Officer M.V. indicating that: (1) although there was a specific code number M.V. could have used on the monthly report submitted to the FRA which would have disclosed Plaintiff was hit by a fixed sign that was too close to the railroad tracks, the Railroad omitted such a code on the report; and (2) although M.V. could have identified that Plaintiff's workplace accident was caused by something Plaintiff did wrong in the monthly report submitted to the FRA by reporting a "human factor cause" of the accident, the Railroad omitted such an identifier in the report.

27

## 2. The Relevant Standard of Review and Portions of Sections 20901(a) and 20903

For purposes of this appeal only, we assume *arguendo* that the Railroad preserved its claim that the trial court erred in admitting portions of Officer M.V.'s testimony regarding the Railroad's internal Form 98 report and its monthly report to the Federal Railroad Administration (collectively "Officer M.V.'s challenged testimony"). An appellate court reviews a challenge to a trial court's admission of evidence for an abuse of discretion. *Dash*, 668 S.W.3d at 588. An abuse of discretion occurs when the trial court's decision "is clearly against the logic of the circumstances and is so unreasonable as to indicate a lack of careful consideration." *Id.* (citation omitted).

The Railroad asserts Officer M.V.'s challenged testimony was inadmissible in that it was privileged under sections 20901(a) and 20903. To determine the applicability of these federal statutes, we engage in statutory interpretation, which raises a question of law requiring *de novo* review. *See Luman*, 323 S.W.3d at 824. "[T]he primary rule of statutory interpretation is to give effect to legislative intent as reflected in the plain language of the statute at issue." *Collector of Winchester*, 660 S.W.3d at 415-16 (citation and internal quotations omitted).

Section 20901(a) provides in relevant part:

> Not later than [thirty] days after the end of each month, a railroad carrier shall file a report with the Secretary of Transportation on all accidents and incidents resulting in injury or death to an individual or damage to equipment or a roadbed arising from the carrier's operations during the month. The report shall be under oath and shall state the nature, cause, and circumstances of each reported accident or incident.

*Id.*[26] In addition, section 20903 states in relevant part: "No part of an accident or incident

---

[26] Although section 20901(a) provides a monthly accident report is to be filed with the Secretary of Transportation, the parties, Officer M.V.'s deposition, and case law from other jurisdictions refer to the federal entity the monthly reports are filed with as the Federal Railroad Administration. *See, e.g., Ast v. BNSF Ry. Co.*, No. 09-2519-EFM, 2011 WL 1899284, at *3, *3 n.4 (D. Kan. May 19, 2011). Therefore, for purposes of this opinion only, we find the monthly report is to be filed with the FRA.

report filed by a railroad carrier under section 20901 of this title . . . may be used in a civil action for damages resulting from a matter mentioned in the report." Section 20903. Importantly, statutory privileges, including the statutory privilege set out in section 20903, are narrowly construed. *U.S. v. Nixon*, 418 U.S. 683, 709-10 (1974); *Villa v. Burlington Northern & Santa Fe Railway Co.*, 397 F.3d 1041, 1047 (8th Cir. 2005).

3.      **This Court's Holdings Regarding the Admissibility of Evidence Under Sections 20901(a) and 20903**

Viewing the plain meaning of sections 20901(a) and 20903 narrowly, *see Nixon*, 418 U.S. at 709-10 and *Villa*, 397 F.3d at 1047, we hold the following.

Sections 20901(a) and 20903 provide that no part of a railroad's monthly accident report filed with the FRA is admissible in a civil action for damages resulting from an accident mentioned in the report. *See id*. In addition, plaintiff's counsel may not circumvent sections 20901(a) and 20903 by asking a witness to testify to matters she has learned *only* from a railroad's monthly accident report to the FRA. *See Stark-Romero v. National R.R. Passenger Co. (AMTRAK)*, 276 F.R.D. 531, 538-39 (D.N.M. 2011) (similarly holding with respect to a different federal statute providing for certain reports and documents to be privileged); *see also Anderson v. Dakota, Minnesota & Eastern Railroad Corporation*, No. CV 15-2672 (PAM/TNL), 2016 WL 6916806, at *1-2 (D. Minn. Nov. 22, 2016) (citing section 20903 and holding an expert witness may not testify as to information he or she learned only from the monthly accident report to the FRA). Accordingly, if a witness has not learned of the information in a monthly accident report to the FRA from other documents or from her own personal knowledge, her testimony regarding such information is inadmissible. *See id*.; *cf*. 34A MOPRAC section 21:11.1.[27] (citing section 20903 and indicating in relevant part that the contents of a monthly

---

[27] All references to 34A MOPRAC section 21:11.1. are to the August 2023 update.

29

accident report to the FRA may be admissible if, *inter alia*, they are "obtained by other means" from "a witness who had a role in preparing the report").

In contrast, a witness's testimony about information she gained *independently* of the monthly accident report to the FRA is not protected by sections 20901(a) and 20903 and is admissible. *Stark-Romero*, 276 F.R.D. at 538-39 (similarly holding with respect to a different federal statute providing for certain reports and documents to be privileged). Therefore, testimony from a witness regarding information in a monthly accident report to the FRA is admissible if she learned of the information from other documents or from her own personal knowledge. *See id.*; *Anderson*, 2016 WL 6916806, at *1-2; 34A MOPRAC section 21:11.1.

In addition, because a railroad's internal reports are not required to be filed under section 20901(a), such reports are not covered by the statutory privilege found in section 20903. *See id.*; section 20901(a); *see also Villa*, 397 F.3d at 1047 and *Ast v. BNSF Ry. Co.*, No. 09-2519-EFM, 2011 WL 1899284, at *2-3 (D. Kan. May 19, 2011) and *Kehdi v. BNSF Ry. Co.*, No. CIV. 06-6242-AA, 2007 WL 2994600, at *2 (D. Or. Oct. 11, 2007) (all similarly holding). Therefore, a railroad's internal reports and a witness's testimony about matters contained in the internal reports are admissible. *See id.*

4. **Analysis as to the Railroad's Arguments that Portions of Officer M.V.'s Deposition Testimony Were Inadmissible Because They Were Privileged Under Sections 20901(a) and 20903 and This Court's Conclusion as to the Railroad's Fourth Point on Appeal**

In this case, the Railroad first argues that portions of Officer's M.V.'s deposition testimony regarding the Railroad's internal Form 98 report were privileged under sections 20901(a) and 20903. As stated above, because a railroad's internal reports are not required to be filed under section 20901(a), such reports are not covered by the statutory privilege found in

section 20903.[28]  *See id.*; section 20901(a); *see also Villa*, 397 F.3d at 1047; *Ast*, 2011 WL 1899284, at *2-3; *Kehdi*, 2007 WL 2994600, at *2.  Therefore, we hold M.V.'s testimony about matters contained in the Railroad's internal Form 98 report was admissible.  *See id.*

The Railroad also asserts that M.V.'s deposition testimony regarding statements and omissions in the Railroad's monthly report to the Federal Railroad Administration were privileged under section 20903.  The record reflects Officer M.V. was a Railroad corporate representative at trial and that she learned of the information regarding statements and omissions in the monthly report from her own personal knowledge due to her department's role in preparing the report.  Under these circumstances, we hold M.V.'s deposition testimony regarding the monthly report was admissible.  *See Stark-Romero*, 276 F.R.D. at 538-39; 34A MOPRAC section 21:11.1.; *see also Ford v. Ford Motor Co.*, 585 S.W.3d 317, 330 (Mo. App. W.D. 2019) (holding "a . . . [corporate representative witness] . . . [is] required to provide information within h[er] personal knowledge in responding to questioning by [p]laintiff['s] counsel").

Based on the foregoing, the trial court did not err in admitting Officer M.V.'s challenged deposition testimony.  The Railroad's fourth point on appeal is denied.

---

[28] The Railroad argues its internal report Form 98 at issue in this case is covered by the statutory privilege found in section 20903 pursuant to holdings in multiple cases from other jurisdictions.  We find the Railroad's reliance on these cases is misplaced because they are distinguishable.  *See Lopez by Ilarrava v. CSX Transportation, Inc.*, No. 3:14-cv-257, 2021 WL 2810117, at *14 (W.D. Pa. July 6, 2021) (granting a railroad's motion to exclude a railroad's internal reports at trial where, *unlike the circumstances of this case*, the plaintiff did not contest the railroad's position and the reports involved were different than the internal Form 98 report at issue here); *Broadus v. CSX Transp., Inc.*, No. CIV.A. 08-1201, 2009 WL 1402025, at *1, *3-4 (E.D. La. May 14, 2009) (granting a railroad's motion to exclude "FRA reports related to plaintiff's accident" where, *unlike the circumstances of this case*, the plaintiff asserted he did not intend to use the contested evidence and the parties did not identify what specific reports were at issue in the case); *Scotto v. Long Island R.R.*, No. 05 CIV. 4757 (PKL), 2007 WL 894332, at *1, *4-5 (S.D.N.Y. Mar. 20, 2007) (granting a railroad's motion to exclude where, *unlike the circumstances of this case*, the evidence at issue involved "official accident reports and investigation documents *of the U.S. Department of Transportation Federal Railroad Administration* regarding the accident" instead of *the Railroad's* internal Form 98 at issue here) (emphasis added).

**D. Whether the Trial Court Erred in Excluding a Portion of Officer M.V.'s Video Deposition Testimony**

In the Railroad's fifth point on appeal, it claims the trial court erred in excluding a portion of Officer M.V.'s video deposition testimony regarding whether the Railroad verbally reported to the FRA that Plaintiff informed the Railroad he had been struck by a sign during his workplace accident. For the reasons discussed below, we disagree.

**1. The Relevant Procedural Posture and Standard of Review**

At trial, the Railroad attempted to introduce the following portion of Officer M.V.'s deposition testimony:

| [Plaintiff's counsel]: | [] [W]ould you agree with me that there is nothing that [the Railroad] . . . did to inform the FRA that [Plaintiff] reported having hit a fixed sign causing him to be knocked off the locomotive as he was boarding it? |
| --- | --- |
| [Officer M.V.]: | *It's my understanding* that the FRA was on site the [day after Plaintiff's workplace accident], and *if* [Railroad employee C.K.] had a briefing in which the FRA was present in which [he] reported th[e] information that . . . he had spoken to [Plaintiff] and there had been a discussion of the [derail] sign, so *I think* that the FRA was aware of it. It was not placed on [the internal Form 98 report]. |

(emphasis added). Plaintiff objected to the admission of the testimony on the basis it was, *inter alia*, speculative, and the trial court excluded it on this basis.[29]

It is undisputed the Railroad's claim that the trial court erred in excluding the above testimony is preserved for appeal. "The trial court has broad discretion in determining whether to admit deposition testimony" and "[an appellate] court will not disturb the [trial] court's decision to exclude deposition testimony absent an abuse of that discretion." *Hemeyer v. Wilson*, 59 S.W.3d 574, 580 (Mo. App. W.D. 2001). An abuse of discretion occurs when the trial court's

---

[29] The trial court's detailed findings will be set out in detail below in Section II.D.2. of this opinion.

decision "is clearly against the logic of the circumstances and is so unreasonable as to indicate a lack of careful consideration." *Dash*, 668 S.W.3d at 588 (citation omitted)

### 2.    Analysis and Conclusion as to Plaintiff's Fifth Point on Appeal

In this case, the trial court excluded Officer M.V.'s challenged testimony at issue in this point because it was speculative, finding in relevant part:

> . . . [T]here's too many contingencies in her response. *It's my understanding* that [the] FRA was on the site the next day, and if [C.K.] had a briefing in which [the] FRA was present, so *she's assuming that if he was there when [the] FRA [was]* -- and [] [C.K.] reported the information that . . . he had spoken to [Plaintiff] and that there had been discussion of the [derail] sign[.] [T]here's another contingency or another speculative reply.
>
> So *I think* that the FRA was aware of it. She doesn't know if the FRA was aware of it. It was not placed on [the internal Form 98 report]. So she is kind of *if* this happened, *if* they were there, *if* this person had a discussion, *if* [C.K.] had been there, had spoken to [Plaintiff], had a discussion of signs. I think on top of all of that, *if* FRA was aware of it, yes, this is the reason why.

(emphasis added).

We hold the trial court's exclusion of M.V.'s testimony did not constitute an abuse of discretion. *See id.*; *Hemeyer*, 59 S.W.3d at 580.  A witness's testimony is properly excluded on the grounds it is speculative "[i]f a witness . . . admits to facts, conditions or circumstances which make it evident h[er] testimony was a mere guess on h[er] part" because "then h[er] testimony does not constitute substantial evidence and has no probative value." *Stearns v. Be-Mac Transport Co., Inc.*, 621 S.W.2d 539, 541 (Mo. App. E.D. 1981) (citation omitted); *see also Hemeyer*, 59 S.W.3d at 580-81 (similarly holding).  As indicated in the trial court's detailed findings, Officer M.V.'s entire testimony indicating it was her understanding and thought that the FRA was aware Plaintiff reported he was hit by a sign was conditioned on "*if* [Railroad employee C.K.] had a briefing in which the FRA was present in which [he] reported th[e] information."  Under these circumstances, M.V.'s testimony does not constitute substantial

33

evidence that the FRA was informed of Plaintiff's report that he was hit by a sign, and the testimony has no probative value as to this issue. *See id.* Therefore, the trial court did not abuse its discretion in excluding M.V.'s testimony at issue in this point on appeal on the basis it was speculative. *See id.* The Railroad's fifth point on appeal is denied.

**E.      Whether the Trial Court Erred in Admitting a Portion of Superintendent W.C.'s Video Deposition Testimony**

In the Railroad's sixth point on appeal, it argues the trial court erred in admitting a portion of Superintendent W.C.'s video deposition testimony at trial because the testimony played for the jury omitted a special master's question and an exchange between W.C. and the special master,[30] thereby allegedly misleading and confusing the jury. For the reasons discussed below, we find the Railroad has not preserved this claim for review, and we decline to exercise our discretion to review the Railroad's sixth point on appeal for plain error. *See Denney v. Syberg's Westport, Inc.*, 665 S.W.3d 348, 354-55 (Mo. App. E.D. 2023); *see also* Rule 84.13(c).[31]

A pre-trial motion to exclude or strike testimony is the equivalent of a motion in limine. *Rosales v. Benjamin Equestrian Center, LLC*, 597 S.W.3d 669, 685 (Mo. App. W.D. 2019); *Alberswerth v. Alberswerth*, 184 S.W.3d 81, 100 (Mo. App. W.D. 2006). A trial court's denial of a motion in limine is an interlocutory ruling subject to change during the course of the trial and, without more, preserves nothing for appellate review. *Rhoden v. Missouri Delta Medical Center*, 621 S.W.3d 469, 484 (Mo. banc 2021). To adequately preserve a challenge to the admission of evidence after the denial of a motion in limine, a party is required to make a

---

[30] The trial court appointed a special master to attend the deposition of Superintendent W.C. as a sanction against the Railroad because, as found by the trial court: (1) counsel for the Railroad made excessive, meritless, and improper objections during a previous deposition of corporate representative C.D. which "seem[ed] designed to signal and coach the witness"; (2) C.D. gave incomplete answers in his deposition; and (3) the Railroad failed to produce documents which Plaintiff properly requested.

[31] All references to Rule 84.13 are to the version of Missouri Supreme Court Rule 84.13 effective from July 1, 2012, to the present.

specific objection to the evidence at the time of its attempted admission at trial and reassert the objection in an after-trial motion. *Id.*

In this case, the Railroad objected to the portion of W.C.'s testimony at issue in this point in a motion to strike which was argued and partially denied at a pre-trial conference addressing deposition designations and objections. Notably, however, the Railroad did not object to the admission of W.C.'s video deposition at trial. Accordingly, the Railroad's challenge to the admission of W.C.'s video deposition at issue in this point on appeal raises a claim of trial court error that is not preserved for appellate review. *See id.*; *see also Rosales*, 597 S.W.3d at 685-86; *Alberswerth*, 184 S.W.3d at 100; *cf. State v. Woods*, 336 S.W.3d 473, 474-75, 474 n.1, 475 n.2 (Mo. App. E.D. 2011) (holding a party preserved a claim relating to the admission of video deposition testimony for appeal when the party raised an objection pre-trial *and* objected to its admission at trial).

"This Court retains discretion to review unpreserved arguments for plain error." *Denney*, 665 S.W.3d at 355 (citing Rule 84.13(c)). "However, plain error review is rarely applied in civil cases, and may not be invoked to cure the mere failure to make proper and timely objections." *Denney*, 665 S.W.3d at 355 (citation and internal quotations omitted).

In this civil case, the Railroad failed to make a proper and timely objection to the admission of W.C.'s video deposition testimony at trial. Additionally, the Railroad "has not asked this Court to consider its argument for plain error and thus has not provided us any reason to do so." *See Church v. CNH Industrial America, LLC*, 671 S.W.3d 829, 842 (Mo. App. W.D. 2023). Under these circumstances, our Court declines to exercise its discretion to review the Railroad's sixth point on appeal for plain error. *See id.*; *Denney*, 665 S.W.3d at 355; *see also* Rule 84.13(c). The Railroad's sixth point on appeal is denied.

**F.      Whether the Trial Court Committed Reversible Error in Admitting Two Exhibits Prepared by Nurse L.S.**

In the Railroad's seventh point on appeal, it contends the trial court committed reversible error in admitting two exhibits prepared by Nurse L.S. – Exhibit Nos. 107 and 107A – because the exhibits constituted inadmissible hearsay and allegedly prejudiced the Railroad because the exhibits were given to the jury during deliberations.  For the reasons discussed below, we deny the Railroad's seventh point on appeal.

**1.      The Relevant Facts, Procedural Posture, and Law Regarding Preservation**

L.S., a certified life care planner and registered nurse who had thirty years of experience at the time of Plaintiff's trial, collaborated with Plaintiff's treatment providers and a prosthetist to assess Plaintiff's lifetime healthcare needs.  These needs included: doctor visits; medical equipment and supplies; home and vehicle modifications; prosthetics; medications; and physical therapy.  Nurse L.S. testified Plaintiff's lifetime healthcare needs would cost a total of $3,284,933.92 to $3,880,938.54.

During Nurse L.S.'s testimony at trial, Plaintiff introduced Exhibit No. 107, which was a life care plan L.S. prepared to assess Plaintiff's lifetime healthcare needs ("the Life Care Plan" or "Exhibit No. 107").  The Railroad made a specific hearsay objection to the Life Care Plan at the time of its attempted admission, but the trial court overruled the objection and admitted the exhibit into evidence.  The Life Care Plan contained L.S.'s statements and opinions on Plaintiff's medical history and various topics related to Plaintiff's lifetime healthcare needs.  The Life Care Plan also contained photographs of Plaintiff and his apartment taken by L.S. during her evaluation of Plaintiff which took place approximately one year before Plaintiff's trial.  This Court's review of the record reveals that: (1) none of L.S.'s statements or opinions in the Life

36

Care Plan were shown to the jury during L.S.'s testimony; and (2) only photographs in the Life Care Plan were shown to the jury during L.S.'s testimony.[32]

Plaintiff also introduced another separately marked exhibit during L.S.'s testimony, Exhibit 107A, which was a four-page appendix to the Life Care Plan in the form of a chart setting forth L.S.'s calculations as to the costs of various categories of Plaintiff's lifetime healthcare needs ("Damages Chart" or "Exhibit No. 107A"). The Railroad did not make a specific objection to the Damages Chart at the time of its attempted admission at trial, and the trial court admitted the Damages Chart into evidence. Additionally, this Court's review of the record reveals that the entire Damages Chart was shown to the jury during L.S.'s testimony.

During the jury's deliberations after the close of the evidence, the jury requested to see Exhibit No. 107 (the Life Care Plan). During a discussion between counsel for both parties and the trial court outside the presence of the jury, Plaintiff's counsel requested the trial court give both Exhibit No. 107 (the Life Care Plan) and Exhibit No. 107A (the Damages Chart) to the jury. The Railroad did not object to the trial court giving the Life Care Plan to the jury. However, the Railroad objected to the court giving the Damages Chart to the jury because the jury only requested the Life Care Plan and because the two exhibits were different. The trial court overruled the Railroad's objection and gave the jury both the Life Care Plan and the Damages Chart.

In the Railroad's after-trial motions, it alleged the trial court erred in admitting the Life Care Plan because it constituted inadmissible hearsay. However, the Railroad's after-trial motions did not allege any error with respect to the admission of the Damages Chart.

---

[32] The photographs in the Life Care Plan shown to the jury during L.S.'s testimony were images taken by L.S. during her evaluation of Plaintiff. L.S. testified the photographs showed: how Plaintiff was able to transfer from his manual wheelchair to the shower; Plaintiff's two leg stumps and prosthetics; and the primary bathroom Plaintiff used at his apartment.

37

As discussed above, some of the evidence challenged in this point was viewed by the jury during L.S.'s testimony (the photographs in the Life Care Plan and the entirety of the Damages Chart), and the remaining evidence challenged in this point was viewed by the jury for the first time during deliberations (L.S.'s statements and opinions in the Life Care Plan). The preservation standards for challenging the admission of a portion of an exhibit are different depending on when the jury viewed the evidence at issue because its admission did not have any prejudicial effect until the jury saw it for the first time. *See Davolt v. Highland*, 119 S.W.3d 118, 131-36 (Mo. App. W.D. 2003) (similarly holding).

In order to preserve a claim that the erroneous admission of a portion of an exhibit constituted reversible error under circumstances *where the evidence was viewed by the jury during the presentation of evidence*, a party must: (1) make a specific objection at the time of its attempted admission at trial; and (2) reassert the objection in an after-trial motion. *See Rhoden*, 621 S.W.3d at 484; *Davolt*, 119 S.W.3d at 131-34. However, in order to preserve a claim that the erroneous admission of a portion of an exhibit constituted reversible error under circumstances *where the evidence was viewed by the jury for the first time during its deliberation*s, a party must: (1) make a specific objection at the time of its attempted admission at trial; (2) reassert the objection when the jury requests to see the exhibit during deliberations; and (3) again reassert the objection in an after-trial motion. *See Rhoden*, 621 S.W.3d at 484; *Davolt*, 119 S.W.3d at 131, 133, 134-36.

2. **The Railroad's Claim Challenging the Admission of the Photographs in the Life Care Plan**

The Railroad's claim challenging the admission of the photographs in the Life Care Plan is preserved because this evidence was viewed by the jury during the presentation of evidence,

the Railroad made a specific hearsay objection at the time of the Life Care Plan's attempted admission at trial, and the objection was reasserted in the Railroad's after-trial motions. *See Rhoden*, 621 S.W.3d at 484; *Davolt*, 119 S.W.3d at 131-34. Accordingly, we review the portion of the trial court's decision admitting the photographs in the Life Care Plan for an abuse of discretion. *See Porter v. City of St. Louis*, 552 S.W.3d 166, 172 (Mo. App. E.D. 2018). An abuse of discretion occurs when the trial court's decision "is clearly against the logic of the circumstances and is so unreasonable as to indicate a lack of careful consideration." *Dash*, 668 S.W.3d at 588 (citation omitted).

In this case, the photographs in the Life Care Plan do not constitute hearsay because they are simply images and they do not contain any statements. *See Koenen v. BRG Liberty, LLC*, 647 S.W.3d 47, 61 (Mo. App. E.D. 2022) ("[] hearsay [] is any out-of-court *statement* that is used to prove the truth of the matter asserted and that depends on the veracity of the statement for its value") (emphasis added) (quoting *State v. Kemp*, 212 S.W.3d 135, 146 (Mo banc 2007)). Accordingly, the Railroad's claim that the trial court abused its discretion in admitting the photographs in the Life Care Plan because they constituted inadmissible hearsay has no merit. *See id*.

3.  **The Railroad's Claims Challenging the Admission of L.S.'s Statements and Opinions in the Life Care Plan and the Admission of the Entirety of the Damages Chart**

The Railroad's claim challenging the admission of L.S.'s statements and opinions in the Life Care Plan is not preserved for appellate review because this evidence was viewed by the jury for the first time during deliberations and the Railroad did not object to the trial court giving the Life Care Plan to the jury. *See Rhoden*, 621 S.W.3d at 484; *Davolt*, 119 S.W.3d at 131, 133, 134-36. Additionally, the Railroad's claim challenging the admission of the entirety of the Damages Chart, which was viewed by the jury during the presentation of evidence, is not

39

preserved for appellate review because the Railroad did not make a specific objection to the Damages Chart at the time of its attempted admission at trial and because there was no objection to the evidence asserted in the Railroad's after-trial motions. *See Rhoden*, 621 S.W.3d at 484; *Davolt*, 119 S.W.3d at 131-34.

As previously discussed, "[t]his Court retains discretion to review unpreserved arguments for plain error." *Denney*, 665 S.W.3d at 355 (citing Rule 84.13(c)). "However, plain error review is rarely applied in civil cases, and may not be invoked to cure the mere failure to make proper and timely objections." *Denney*, 665 S.W.3d at 355 (citation and internal quotations omitted).

In this civil case, the Railroad "has not asked this Court to consider its argument for plain error and thus has not provided us any reason to do so." *See Church*, 671 S.W.3d at 842. Under these circumstances, our Court declines to exercise its discretion to review the Railroad's claims challenging the admission of L.S.'s statements and opinions in the Life Care Plan and the admission of the entirety of the Damages Chart for plain error. *See id.*; *Denney*, 665 S.W.3d at 355; *see also* Rule 84.13(c).

#### 4. Conclusion as to the Railroad's Seventh Point on Appeal

Based on the foregoing, the Railroad's seventh point on appeal is denied.

### III. DISCUSSION OF THE RAILROAD'S EIGHTH POINT ON APPEAL

In the Railroad's eighth and final point on appeal, the Railroad claims the trial court's January 2023 amended judgment awarding Plaintiff post-judgment interest is erroneous because the trial court did not have jurisdiction to make the award under the circumstances of this case. For the reasons discussed below, we agree.

## A.    The Relevant Procedural Posture

The only specific relief Plaintiff alleged he was entitled to in his petition was damages and costs; the petition did not allege he was entitled to post-judgment interest. After the jury trial in this case, the trial court's November 2022 original judgment awarded Plaintiff damages and costs and did not refer to or award post-judgment interest. Additionally, there is no evidence in the record to suggest the trial court intended to include a post-judgment interest rate or order payment of such interest at the time the November 2022 original judgment was entered.

After the trial court entered its November 2022 judgment awarding Plaintiff damages and costs, Plaintiff did not file any timely authorized after-trial motions. *See* Section III.C. of this opinion. However, the Railroad filed timely authorized after-trial motions requesting a new trial or JNOV alleging the trial court committed multiple errors. *See Heifetz v. Apex Clayton, Inc.*, 554 S.W.3d 389, 393 (Mo. banc 2018); *Southside Ventures, LLC v. La Crosse Lumber Co.*, 574 S.W.3d 771, 780, 780 n.2 (Mo. App. W.D. 2019); Rule 78.04;[33] Rule 75.01;[34] Rule 72.01(b).[35]

The trial court entered an order denying the Railroad's timely authorized after-trial motions on January 12, 2023. On January 20, 2023, Plaintiff filed a motion to amend the November 2022 judgment to award post-judgment interest and this was the first time in the case Plaintiff requested post-judgment interest. Plaintiff's motion to amend only cited to and relied on language in two Missouri Supreme Court Rules: Rule 78.07(d)[36] and Rule 75.01. Plaintiff's motion specifically alleged the trial court had authority to amend the November 2022 judgment

---

[33] All references to Rule 78.04 are to the version of Missouri Supreme Court Rule 78.04 effective from January 1, 2010, to the present.

[34] All references to Rule 75.01 are to the version of Missouri Supreme Court Rule 75.01 effective from January 1, 1981, to the present.

[35] This reference to Rule 72.01(b) is to the version of Missouri Supreme Court Rule 72.01(b) (effective from January 1, 1994).

[36] All references to Rule 78.07 are to the version of Missouri Supreme Court Rule 78.07 effective from July 1, 2017, to the present.

to award post-judgment interest because interest was mandated by section 408.040.3[37] and because "Rule 78.07(d) provides [in relevant part] that '[t]he trial court may amend or modify any judgment in accordance with Rule 75.01 or upon motion by any party.'" (bracketed alteration added and quoting Rule 78.07(d)).

On the same date Plaintiff filed his motion to amend the November 2022 judgment (January 20, 2023): (1) the Railroad filed a motion in opposition to the motion to amend on the grounds the trial court lacked jurisdiction to amend the November 2022 judgment; (2) the Railroad filed a notice of appeal asserting it was appealing the November 2022 judgment; and (3) the trial court entered a January 2023 amended judgment awarding Plaintiff post-judgment interest. Subsequently, the Railroad filed an amended notice of appeal challenging the January 2023 amended judgment.

## B.     The Standard of Review and Relevant Law Regarding Post-Judgment Interest

It is undisputed the Railroad preserved its claim that the trial court's January 2023 amended judgment awarding Plaintiff post-judgment interest is erroneous because the trial court did not have jurisdiction to make the award under the circumstances of this case. The question of whether a trial court had jurisdiction over a case at the time it enters a ruling is a question of law that an appellate court reviews *de novo*. *Payne v. Markeson*, 414 S.W.3d 530, 536 (Mo. App. W.D. 2013) (citing *McCracken v. Wal-Mart Stores East, LP*, 298 S.W.3d 473, 476 (Mo. banc 2009)). Additionally, our review of the Railroad's claim in this point involves the interpretation and application of section 408.040 and various Missouri Supreme Court Rules, which constitute questions of law subject to *de novo* review. *SKMDV Holdings, Inc. v. Green Jacobson, P.C.*, 494 S.W.3d 537, 560 (Mo. App. E.D. 2016).

---

[37] Unless otherwise indicated, all references to section 408.040 are to RSMo 2016 (effective from January 15, 2015, to the present).

Section 408.040 provides for post-judgment interest and its purpose is "to compensate a judgment creditor for the judgment debtor's delay in satisfying the judgment pending the judgment debtor's appeal." *SKMDV Holdings*, 494 S.W.3d at 561 (discussing a former, substantively similar version of the statute and quoting *Moore ex rel. Moore v. Bi–State Development Agency*, 132 S.W.3d 241, 243 (Mo. banc 2004)); *see also* section 408.040.  Section 408.040.3 governs tort actions like the one in this case, *see id*., and provides in relevant part:

> [I]n tort actions, interest shall be allowed on all money due upon any judgment or order of any court from the date judgment is entered by the trial court until full satisfaction. All such judgments and orders for money shall bear a per annum interest rate equal to the intended Federal Funds Rate, as established by the Federal Reserve Board, plus five percent, until full satisfaction is made. The judgment shall state the applicable interest rate, which shall not vary once entered.

*Id*.

Importantly, even though an award of post-judgment interest is mandated by section 408.040.3, existing Missouri case law provides that an award of post-judgment interest can only be made: (1) in the original judgment; (2) pursuant to Rule 75.01; (3) pursuant to a timely amendment following a Rule 78.07 motion; or (4) pursuant to a *nunc pro tunc* judgment under Rule 74.06(a)[38] where there is evidence in the record that that trial court intended to include a post-judgment interest rate or order payment of such interest at the time the original judgment was entered.  *SKMDV Holdings*, 494 S.W.3d at 561-62 (citing *Peterson v. Discover Property & Casualty Insurance Company*, 460 S.W.3d 393, 413 (Mo. App. W.D. 2015) (citing *McGuire v. Kenoma, LLC*, 447 S.W.3d 659, 666-67 (Mo. banc 2014))); Rule 74.06(a); *see also Yusupova v. Noble*, 527 S.W.3d 879, 881 (Mo. App. E.D. 2017) ("[a] trial court . . .  lacks jurisdiction to entertain proceedings affecting a judgment after it becomes final, unless the court utilizes [any]

---

[38] All references to Rule 74.06 are to the version of Missouri Supreme Court Rule 74.06 effective from January 1, 1988, to the present.

applicable Supreme Court rules for relief from judgment [under Rule 74.06]");[39] footnote 42 of this opinion.

Accordingly, we hold that if a trial court enters an amended judgment purporting to award post-judgment interest for the first time after the original judgment is final, the trial court lacked jurisdiction to enter the amended judgment and the amended judgment is untimely, void, and must be reversed on appeal. *See SKMDV Holdings*, 494 S.W.3d at 561-63; *see also Yusupova*, 527 S.W.3d at 881; *Peterson*, 460 S.W.3d at 413 (citing *McGuire*, 447 S.W.3d at 666-67); Rule 74.06(a).[40]

## C. Analysis as to Whether the Trial Court's Award of Post-Judgment Interest was Authorized

As previously stated, existing Missouri case law provides that an award of post-judgment interest can only be made: (1) in the original judgment; (2) pursuant to Rule 75.01; (3) pursuant to a timely amendment following a Rule 78.07 motion; or (4) pursuant to a *nunc pro tunc* judgment under Rule 74.06(a) where there is evidence in the record that that trial court intended to include a post-judgment interest rate or order payment of such interest at the time the original judgment was entered. *SKMDV Holdings*, 494 S.W.3d at 561-62 (citing *Peterson*, 460 S.W.3d at 413) (citing *McGuire*, 447 S.W.3d at 666-67)); *see also Yusupova*, 527 S.W.3d at 881; Rule 74.06; footnote 42 of this opinion. Because the trial court's purported award of post-judgment

---

[39] *See also* 12 MOPRAC section 3:87 (July 2023 update) (providing "[t]he provisions of Missouri law for relief from a judgment or order are . . . set forth [in] [Rule] 74.06"); Rule 74.06 (titled "Relief From Judgment or Order").
[40] We note this holding only applies to amended judgments purporting to award post-judgment interest for the first time after the original judgment is final and does not apply to any judgments granting a motion for relief from judgment under Rule 74.06 if a court finds such a motion is authorized. *See McGuire*, 447 S.W.3d at 663-64 (holding in relevant part that "unlike an amended judgment under Rule 75.01, a correction by a *nunc pro tunc* judgment does not create a new judgment[;] [i]nstead, the corrected judgment relates back to the time the original judgment was issued . . .") (emphasis added); *McCullough v. Commerce Bank, N.A.*, 368 S.W.3d 296, 300 (Mo. App. W.D. 2012) (indicating a judgment granting a Rule 74.06(b) motion is unlike an amended judgment because "a Rule 74.06(b) motion filed after a judgment becomes final is an independent action requiring the trial court to enter a separate judgment").

interest in this case was not made under any of these four circumstances, the trial court's award was not authorized. *See id*.

First, the trial court's November 2022 original judgment did not refer to or award post-judgment interest.

Second, the award of post-judgment interest in the January 2023 amended judgment was not made pursuant to Rule 75.01. "Rule 75.01 provides [in relevant part]: 'The trial court retains control over judgments during the thirty-day period after entry of judgment and may, after giving the parties an opportunity to be heard and for good cause, vacate, reopen, correct, amend, or modify its judgment within that time.'" *Heifetz*, 554 S.W.3d at 393 (quoting Rule 75.01). "The filing of a timely authorized after-trial motion extends a trial court's jurisdiction for up to ninety days after the filing of the motion." *Heifetz*, 554 S.W.3d at 393 (citation and internal quotations omitted); *see also* Rule 81.05.[41] "Once the thirty day period in Rule 75.01 expires, a trial court's authority to grant relief is constrained by and limited to the grounds raised in a timely filed, authorized after-trial motion." *Heifetz*, 554 S.W.3d at 393 (citation omitted). In this case, the trial court's January 2023 amended judgment purporting to award post-judgment interest was entered on January 20, 2023, more than thirty days after the trial court's November 2022 original judgment was entered on November 4, 2022. Therefore, Rule 75.01 did not authorize the trial court to award post-judgment interest in this case. *See id*.; *Heifetz*, 554 S.W.3d at 393.

The award of post-judgment interest in the January 2023 amended judgment was also not made pursuant to a timely amendment following a Rule 78.07 motion. Rule 78.07(d) provides in relevant part: "The trial court may amend or modify any judgment . . . upon motion by any party." *Id*. It is undisputed that Plaintiff's motion to amend the November 2022 judgment

---

[41] All references to Rule 81.05 are to the version of Missouri Supreme Court Rule 81.05 effective from January 1, 2000, to the present.

requesting an award of post-judgment interest, filed on January 20, 2023, was an authorized after-trial motion.[42] *See Payne*, 414 S.W.3d at 538 (citing Rule 78.04 and *Taylor v. United Parcel Service, Inc.*, 854 S.W.2d 390, 392 n. 1 (Mo. banc 1993)). However, Plaintiff's motion to amend was untimely filed. Motions to amend a judgment must be filed no later than thirty days after entry of judgment. Rule 78.04. The trial court entered its November 2022 judgment on November 4, 2022. Plaintiff's motion to amend was filed on January 20, 2023, more than thirty days after entry of November 2022 judgment. Therefore, Rule 78.07 did not authorize the trial court to award post-judgment interest in this case. *See* Rule 78.07(d); Rule 78.04.

Finally, the award of post-judgment interest in the January 2023 amended judgment was not made pursuant to a *nunc pro tunc* judgment under Rule 74.06(a). Neither Plaintiff's motion to amend the November 2022 judgment nor the trial court's judgment cited to Rule 74.06(a) or otherwise indicated Rule 74.06(a) was being utilized. Additionally, Plaintiff could not obtain relief from the November 2022 judgment pursuant to a *nunc pro tunc* judgment under Rule 74.06(a) in this case because there is no evidence in the record to suggest the trial court intended to include a post-judgment interest rate or order payment of such interest at the time the November 2022 original judgment was entered. *See SKMDV Holdings*, 494 S.W.3d at 562 (citing *Peterson*, 460 S.W.3d at 413 (citing *McGuire*, 447 S.W.3d at 666-67)).

---

[42] Plaintiff argues its motion to amend the November 2022 judgment was, in substance, a Rule 74.06(b) motion seeking relief due to mistake or inadvertence. *See id.*; Rule 74.06(b)(1) and Rule 74.06(c) (collectively providing a Rule 74.06(b) motion based on mistake or inadvertence may be made up to one year after entry of an original judgment); *see also Worley v. Worley*, 19 S.W.3d 127, 129 (Mo. banc 2000) ("[a] pleading is judged by its subject matter – not its caption"). This argument has no merit because: (1) Plaintiff's motion to amend only cited to and relied on language in two Missouri Supreme Court Rules: Rule 78.07(d) and Rule 75.01; (2) the substance of Plaintiff's motion to amend does not allege the failure to request post-judgment interest at a previous time was based on any mistake or inadvertence; and (3) the substance of the trial court's January 2023 amended judgment does not indicate the award of post-judgment interest was based on any portion of Rule 74.06(b) or any principles therein. Under these circumstances, it is unnecessary for this Court to determine in this case whether an award of post-judgment interest based on any portion of Rule 74.06(b) is authorized. *See* Rule 74.06(b)(1)-(5) (allowing relief from a final judgment for various reasons including: mistake, inadvertence, surprise, excusable neglect, fraud, misrepresentation, other misconduct of an adverse party, if the judgment is irregular, or if the judgment is void).

In sum, the trial court's award of post-judgment interest in the January 2023 amended judgment was not authorized by existing Missouri case law.

**D.  Analysis as to When the Trial Court's November 2022 Original Judgment Became Final and the Effect of that Finality on the January 2023 Amended Judgment**

As previously indicated, a trial court retains control over its judgments for thirty days after entry, during which time it may "vacate, reopen, correct, amend, or modify its judgment." Rule 75.01.  When no timely authorized after-trial motion is filed, a judgment becomes final at the expiration of thirty days after its entry.  Rule 81.05(a)(1).  However, when a party timely files an authorized after-trial motion, the judgment becomes final at the earlier of the following:

> (A) Ninety days from the date the last timely motion was filed, on which all motions not ruled shall be deemed overruled; or
>
> (B) If all motions have been ruled, then the date of ruling of the last motion to be ruled or thirty days after entry of judgment, whichever is later.

Rule 81.05(a)(2); *Heifetz*, 554 S.W.3d at 393.

In this case, the trial court entered the November 2022 original judgment on November 4, 2022.  Within thirty days, the Railroad filed timely authorized after-trial motions requesting a new trial or JNOV alleging the trial court committed multiple errors in entering the November 2022 judgment.  Plaintiff did not file any timely authorized after-trial motions, and the trial court denied the Railroad's after-trial motions on January 12, 2023.

As previously indicated, Rule 81.05(a)(2)(B) provides in relevant part that a judgment becomes final on "the date of ruling of the last motion to be ruled or thirty days after the entry of judgment, *whichever is later*." *Davis v. Kempker*, 167 S.W.3d 721, 725 (Mo. App. W.D. 2005) (emphasis in original and quoting Rule 81.05(a)(2)(B)).  The date of the ruling of the last motion in the present case is January 12, 2023, the date the trial court denied the Railroad's post-trial motions.  *See id*.  Applying Rule 81.05(a)(2)(B), we compare the "date of ruling of the last motion," here January 12, 2023, with the date "thirty days after the entry of judgment," here

47

Monday, December 5, 2022,[43] and use "whichever is later" as the date "the judgment becomes final." *See id*.; *Davis*, 167 S.W.3d at 725. January 12, 2023 is the later date, so the November 2022 original judgment became final on January 12, 2023.[44] *See id*.

Importantly, the trial court's January 2023 amended judgment entered on January 20, 2023, purported to award post-judgment interest for the first time after the November 2022 original judgment became final on January 12, 2023. Under these circumstances, the trial court lacked jurisdiction to enter the January 2023 amended judgment and it was untimely, was void, and must be reversed on appeal. *See SKMDV Holdings*, 494 S.W.3d at 561-63; *see also Yusupova*, 527 S.W.3d at 881; *Peterson*, 460 S.W.3d at 413 (citing *McGuire*, 447 S.W.3d at 666-67); Rule 74.06(a).

**E.      Conclusion as to the Railroad's Eighth Point on Appeal**

Based on the foregoing, we reverse the trial court's January 2023 amended judgment awarding Plaintiff post-judgment interest, and we remand with instructions to the trial court to

---

[43] Because thirty days from November 4, 2022 fell on Sunday, December 4, 2022, the thirty-day period was extended until Monday, December 5, 2022. *See* Missouri Supreme Court Rule 44.01(a) (effective from July 1, 2013, to December 31, 2024).

[44] Plaintiff argues the November 2022 judgment did not become final on January 12, 2023, because the judgment "failed to adjudicate all of [the Railroad's] liability or dispose of the last remaining claim in the suit – [Plaintiff's] right to recover post-judgment interest from [the Railroad] under section 408.040." We find this argument lacks merit for two reasons. First, Plaintiff has failed to cite to any controlling legal authority in support of this argument, and we can find no such legal authority. Second, post-judgment interest was not an issue or claim in the suit at the time the trial court entered its November 2022 judgment on November 4, 2022, or at the time the judgment became final on January 12, 2023, because: (1) the only specific relief Plaintiff alleged he was entitled to in his petition was damages and costs; the petition did not allege he was entitled to post-judgment interest; (2) there is no evidence in the record to suggest the trial court intended to include a post-judgment interest rate or order payment of such interest at the time the November 2022 original judgment was entered; and (3) the first time Plaintiff requested post-judgment interest was in his untimely motion to amend filed on January 20, 2023.

void its January 2023 amended judgment.  *See SKMDV Holdings*, 494 S.W.3d at 563 (similarly holding).  The Railroad's eighth point on appeal is granted.[45]

##                     IV.     CONCLUSION

The trial court's November 2022 judgment awarding Plaintiff $12 million in damages and $15,204.23 in costs is affirmed.  The trial court's January 2023 amended judgment awarding Plaintiff post-judgment interest is reversed, and the case is remanded to the trial court with instructions to void its January 2023 amended judgment.

_____
ROBERT M. CLAYTON III, Presiding Judge

Philip M. Hess, J., concurs,
Cristian M. Stevens, J., dissents in a separate opinion.

---

[45] We note Plaintiff's respondent's brief raises a constitutional claim regarding section 408.040 based on "the Missouri Constitution's Equal Protection [C]lause."  "There are stringent procedural requirements regarding the raising and preservation of constitutional issues." *K.M.M. v. K.E.W.*, 539 S.W.3d 722, 733 (Mo. App. E.D. 2017). "For a constitutional issue to be preserved it must be raised at the first available opportunity." *Id*. at 734.  "If not raised at the first opportunity in the trial court, the constitutional claim is waived and cannot be raised on appeal." *Id*.  Because the record reflects Plaintiff failed to challenge the constitutionality of section 408.040 while the case was pending in the trial court, his challenge to the statute on appeal is unpreserved for our review, is waived, and cannot be raised on appeal.  *See id*.; *see also City of Kansas City v. Troyer*, 670 S.W.3d 77, 82 (Mo. App. W.D. 2023).



# In the Missouri Court of Appeals

# Eastern District

## DIVISION ONE

| | | |
|---|---|---|
| CHRISTOPHER COLE, | ) | No. ED111377 |
| | ) | |
| Respondent, | ) | Appeal from the Circuit Court |
| | ) | of St. Louis County |
| | ) | 20SL-CC02495 |
| vs. | ) | |
| | ) | |
| | ) | |
| THE KANSAS CITY SOUTHERN | ) | |
| RAILWAY COMPANY, | ) | Honorable David Lee Vincent III |
| | ) | |
| Appellant. | ) | Filed: August 13, 2024 |

Dissent

I respectfully dissent from the majority's resolution of Appellant's first two points on appeal. In points one and two, the majority holds the trial court did not err in concluding the Railroad was not entitled to a contributory negligence defense on Plaintiff's negligence *per se* theory. The majority, interpreting 45 U.S.C. §§ 53 and 54a, concludes "the language 'any statute enacted for the safety of employees' in section 53 does not just encompass any federal safety statute but also encompasses any 'regulation, standard or requirement . . . prescribed . . . by a State agency that is participating in investigative and surveillance activities under section 20105 of Title 49' as provided in section 54a." Slip op. at 13.

The majority's reading of Sections 53 and 54a overlooks that the Illinois Commerce Commission is not "a State agency that is participating in investigative and surveillance activities

1

under section 20105 of Title 49" when it regulates close clearances on railroad tracks. *See* Section 54a; *Fletcher v. Chicago Rail Link, L.L.C.*, 568 F.3d 638, 639-40 (7th Cir. 2009). The extent of the majority's analysis is that the Railroad concedes the issue on appeal. Slip op. at 16. While succinct, that analysis is incorrect.

The Railroad's opening brief simply makes the general observation that "Illinois is a participant in the regulatory program described in § 54a of FELA and § 20105(a) of FRSA." The Railroad decidedly does not concede that the Illinois Commerce Commission "is participating in investigative and surveillance activities under section 20105 of Title 49" when it regulates close clearances as it did in Illinois Code § 1500.270, the regulation at issue here. Instead, beginning with the very next sentence of its brief, the Railroad argues, "But there is no federal statute relating to close clearances or any instruction by FRA on implementation of state close clearance laws. Illinois does not investigate or enforce any clearance laws on behalf of the federal government or report any violations of same to any federal agency." As even the majority recognizes two paragraphs after it concludes the Railroad conceded the issue:

> On appeal, the Railroad argues it was entitled to a contributory negligence defense on Plaintiff's negligence *per se* theory because Illinois Code section 1500.270 does not support or implement federal safety norms in that: (1) there is allegedly 'no federal statute relating to close clearances or any instruction by [the] FRA on implementation of state close clearance laws'; and (2) 'Illinois [allegedly] does not investigate or enforce any clearance laws on behalf of the federal government or report any violations of same to any federal agency.' Slip op. at 16.

Regardless, the majority's reading of the statutory text effectively skips the reference in Section 54a of FELA to Section 20105 of FRSA. This court must "give effect to legislative intent as reflected in the plain language of the statute at issue." *Black River Motel, LLC v. Patriots Bank*, 669 S.W.3d 116, 122 (Mo. banc 2023). "In determining the intent and meaning of statutory language, the words must be considered in context and sections of the statutes *in pari*

2

*materia*, as well as cognate sections, . . . to arrive at the true meaning and scope of the words." *Cosby v. Treasurer of State*, 579 S.W.3d 202, 206 (Mo. banc 2019) (quoting *S. Metro. Fire Prot. Dist. v. City of Lee's Summit*, 278 S.W.3d 659, 666 (Mo. banc 2009)).

So, I turn to the plain language of the statutes. Section 54a states, "A regulation, standard, or requirement in force, or prescribed by the Secretary of Transportation under chapter 201 of Title 49 or by a State agency that is participating in investigative and surveillance activities under section 20105 of Title 49, is deemed to be a statute under sections 53 and 54 of this title."

In turn, 49 U.S.C. § 20105(a) states:

> The Secretary concerned may prescribe investigative and surveillance activities necessary to enforce the safety regulations prescribed and orders issued by the Secretary that apply to railroad equipment, facilities, rolling stock, and operations in a State. The State may participate in those activities when the safety practices for railroad equipment, facilities, rolling stock, and operations in the State are regulated by a State authority and the authority submits to the Secretary concerned an annual certification as provided in subsection (b) of this section.

When read together, as they must be, Sections 54a and 20105(a) make clear that a state agency may participate in investigative and surveillance activities necessary to enforce *federal* safety regulations and, when it does so, its regulation is deemed "a statute" for the purpose of obviating a contributory negligence defense. More precisely, under Section 20105(a), the Secretary of Transportation may prescribe investigative and surveillance activities necessary to enforce the safety regulations prescribed and orders issued *by the Secretary of Transportation*, *i.e.*, *federal* safety regulations and orders of the United States Department of Transportation. A state agency may participate in "those activities," *i.e.*, investigative and surveillance activities necessary to enforce *federal* safety regulations and orders. Only when it does so is the state agency "participating in investigative and surveillance activities under section 20105" as required by Section 54a. And only then is the state agency's regulation deemed "a statute" under

3

Section 54a, violation of which is not subject to a contributory negligence defense under Section 53. *See Fletcher*, 568 S.W.3d at 639.

The majority opinion's reading of Section 54a does not account for its explicit reference to Section 20105 and therefore cannot accurately be characterized as an interpretation of the plain language of either statute. Even if the statutory language were not plain and unambiguous, the majority's avoidance of Section 20105(a) would improperly render Section 54a's reference to that section superfluous. *See State ex rel. Swoboda v. Missouri Comm'n on Hum. Rts.*, 651 S.W.3d 800, 806 (Mo. banc 2022) ("As a matter of presumption, the legislature . . . does not include unnecessary or superfluous language.").

Further, my interpretation of Sections 54a and 20105(a) is confirmed by the decision of the United States Court of Appeals for the Seventh Circuit in *Fletcher v. Chicago Rail Link, L.L.C.*, 568 F.3d 638 (7th Cir. 2009). In *Fletcher*, the Seventh Circuit reasoned, based on the plain language of the statutes, that "Section 54a of Title 45 and section 20105(a) of Title 49, when they are read together, make clear that state regulations, requirements, etc., are deemed federal safety regulations only when they make the state a participant in the enforcement of such regulations." *Id.* at 639. The court determined that "Section 54a requires treating state regulations that support or implement federal safety norms as if they were federal regulations." *Id.* at 640. Ultimately, the Seventh Circuit, in which the State of Illinois is situated and which routinely interprets Illinois law, concluded that an Illinois regulation of the use of motor vehicles by railroad workers was not "a statute" under Section 54a because it was unrelated to federal railroad safety norms. *Id.* at 639-41.

Applying Sections 54a and 20105(a) and *Fletcher* to the case at bar, I can conclude only that Illinois Code § 1500.270 regulating close clearances on railroad tracks is not "a statute" as

4

defined in Section 54a. As Plaintiff points out in his brief, the Federal Railroad Administration ("FRA") has delegated authority to states to regulate clearances along tracks to protect railroad workers. The FRA, for its part, admittedly "does not prescribe distances or thresholds relating to the structures near railroad trackage. Each State, through its … State agency, prescribes railroad 'clearance' dimensions, which include minimum distances between railroad tracks and structures." *See* https://railroads.dot.gov/divisions/track/track-frequently-asked-questions (select "Track Clearances" from dropdown menu) (last visited July 29, 2024). Thus, the issue of close clearances is a state safety issue, not a federal safety norm.

The majority opinion dismisses *Fletcher*, first, because decisions of federal circuit courts are not binding on this Court. *See Cook v. Parkland Health Ctr.*, 674 S.W.3d 65, 72 (Mo. App. E.D. 2023); *Foltz v. Burlington Northern R.R. Co.*, 689 S.W.2d 710, 712, 716-17 (Mo. App. W.D. 1985). That is fine as far as it goes, but does not foreclose *Fletcher* as persuasive authority. In fact, this Court routinely cites as persuasive authority the decisions of the United States Court of Appeals for the Eighth Circuit, in which the State of Missouri is situated. *See, e.g., Ackman v. Union Pacific R.R. Co.*, 556 S.W.3d 80, 85 (Mo. App. E.D. 2018) (citing Eighth Circuit FELA cases); *Loth v. Union Pacific R.R. Co.*, 354 S.W.3d 635, 643 (Mo. App. E.D. 2011) (same); *Braddy v. Union Pacific R.R. Co.*, 116 S.W.3d 645, 651 (Mo. App. E.D. 2003) (same). In his appellate brief, Plaintiff likewise repeatedly cites Eighth Circuit FELA cases, like *Cowden v. BNSF Railway Co.*, 690 F.3d 884 (8th Cir. 2012), and *Villa v. Burlington Northern & Santa Fe Railway*, 397 F.3d 1041 (8th Cir. 2005), as well as other federal cases, and acknowledges that decisions of federal courts outside of Missouri are at least "instructive."

Second, the majority opinion characterizes *Fletcher* as "contrary to the plain language of sections 53 and 54a." Slip op. at 17. But the Seventh Circuit in *Fletcher* arrived at its holding by

fully accounting for the plain language of Sections 53 and 54a. The plain language of Section 54a includes its conspicuous reference to Section 20105(a), the text of which the majority opinion relegates to a footnote without further analysis, even in light of *Fletcher*.

*Fletcher* is persuasive not only because it interprets the same sections of FELA and FRSA currently before us, but also because it is a decision of the Seventh Circuit interpreting an Illinois railroad regulation as it relates to FELA and FRSA. Here, we likewise consider an Illinois railroad regulation as it relates to FELA and FRSA, and how they are to be applied in a lawsuit filed in St. Louis County, Missouri, seeking redress of an injury sustained in Godfrey, Illinois.

This Missouri Court's departure from the Seventh Circuit's resolution of FELA, FRSA, and an Illinois regulation in *Fletcher*, which is persuasive authority in Illinois state courts and controlling authority in the federal district courts in Illinois, will unnecessarily sow confusion and encourage forum shopping in St. Louis for injuries sustained in Illinois. Even setting aside the plain language of the federal statutes and the Illinois regulation at issue here, there is no good reason for this Court to contradict the only authoritative decision interpreting the scope of 45 U.S.C. § 54a as it relates to Illinois railroad regulations and thus to create a different rule by which the contributory negligence defense is unavailable under Illinois law when applied in Missouri.

The Seventh Circuit anticipated precisely this uniformity issue in *Fletcher*. The court concluded that state regulations must be related to a federal safety norm, otherwise the resulting patchwork of differing court decisions "would lead to irrational disparities in the enforcement of section 54a." *Fletcher*, 568 S.W.3d at 640. The Seventh Circuit pointed out, for example, that "FELA would mean one thing in Illinois and another thing in Indiana even with regard to

6

identical accidents in two states that had identical safety regulations." *Id.* The lack of uniformity "would be contrary to Congress's determination that 'laws, regulations, and orders related to railroad safety ... shall be nationally uniform to the extent practicable.'" *Id.* (quoting 49 U.S.C. § 20106(a)(1)). Here, we take irrational disparity to a new level: FELA will mean one thing in Illinois and another thing in Missouri even with regard to identical accidents in Illinois to which the same Illinois safety regulation applies.[1]

## Conclusion

As to point I, the trial court erred in submitting Instruction No. 8 and Plaintiff's verdict form because Illinois Code § 1500.270 is not "a statute" for the purpose of contributory negligence under FELA. This error deprived the Railroad of its contributory negligence defense to Plaintiff's negligence *per se* theory. As to point II, the trial court erred in failing to direct a verdict in favor of the Railroad and in denying the Railroad's motion for JNOV because it erroneously concluded that Illinois Code § 1500.270 was "a statute" for the purpose of contributory negligence under FELA on Plaintiff's negligence *per se* theory. For these reasons, I would reverse the judgment rendered against the Railroad in Instruction No. 8 as to point I and reverse and remand to the trial court with directions to enter JNOV in favor of the Railroad as to point II.

---

[1] The majority counters this undeniable uniformity problem with *dicta* from a U.S. Supreme Court case that did not involve railroads or FELA and instead considered whether a state common law tort action is federally preempted by a federal statute or a lack of action by a federal actor. *See Sprietsma v. Mercury Marine*, 537 U.S. 51, 54, 70 (2002). In any event, these considerations are secondary to the plain language of the statutory text as interpreted above. *See, e.g., Spradlin v. City of Fulton*, 982 S.W.2d 255, 261 (Mo. banc 1998) (stating policy concerns may not be considered when plain language is clear).

7

Cristian M. Stevens, Judge